**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**RAIN–WARE, INC., Respondent.**

**No. 83–1494.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 17, 1984.

Decided April 27, 1984.

Fred Harvard, N.L.R.B., Washington, D.C., for petitioner.

Loren J. Comstock, Abbott, Comstock, Goerges & Lohmeier, Indianapolis, Ind., for respondent.

Before CUMMINGS, Chief Judge, and WOOD and POSNER, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Rain-Ware, Inc., appeals from a decision of the National Labor Relations Board adopting the recommended order of an administrative law judge, which concluded that Rain-Ware had violated subsections 8(a)(1) and (a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) (1976), by laying off certain employees and by coercively interrogating and threatening employees with reprisal for union activity. Rain-Ware also appeals the Board's decision that Mike Jones, one of the laid-off employees, was not a supervisor and thus was subject to the Act's protection. We agree that Jones was not a supervisor, and we enforce the Board's order that Rain-Ware cease and desist from unfair labor practices and offer reinstatement to four employees.

## I.

Rain-Ware manufactures and distributes gutters, downspouts, and related products. At the time of concern here, Rain-Ware's facilities consisted of a production plant in one building, and a warehouse and van modification operation (modifying the vans used to install and service gutters) in another building. H.D. Loftiss was Rain-Ware's president and major stockholder, who spent only a few days per week at the Rain-Ware facilities in Indianapolis.

In early September 1980, Loftiss employed a total of nine persons at Rain-Ware. David Farmer was the manager of the Company; on or before September 8, he had given notice of his intention to resign.[1] The production plant was manned by Phillip Smith, Byron (or Barney) Bose, Jeffrey McGuire, and Richard Rhodes, and managed by Tom Parrish. The warehouse was run by Mike Jones. His brother, Jim Jones, modified the vans. John Cecil was the delivery truck driver; he also spent about one-quarter of his time working in the production plant or the warehouse.

In August 1980, Mike Jones had contacted Local 41 of the Sheet Metal Workers Union. Several Rain-Ware employees met with union representatives on September 4; all employees excluding Company manager Farmer signed union authorization cards. The Sheet Metal Workers' and Teamsters' unions then sent a letter, which Farmer received on September 9, notifying the Company that the unions were authorized to represent its employees and seeking recognition. On that day, Farmer mentioned the letter to the employees on two occasions: (1) Parrish and Rhodes testified that they and Smith were on the loading dock when Farmer approached them waving the letter, and saying that Loftiss would close the business and move to Florida; and (2) Cecil testified that in the lunchroom, Farmer asked him what he knew about the letter.[2]

On September 10, Loftiss was at the Company. Farmer testified that Loftiss told Farmer he planned to close the warehouse and lay off some employees. Loftiss inquired of Farmer the minimum number of employees needed to operate the production plant, to which Farmer responded three. Loftiss then directed Farmer to select the three employees to be retained.

1. Farmer left the Company on September 20. He was replaced by John Heim.

2. Parrish also testified that the next day, Farmer called him into his office and asked Parrish what he thought of the letter. Farmer told Parrish that he "knew" Cecil and Mike Jones were involved in the union activity. The ALJ held that Parrish was a supervisor, and thus Farmer's statements to him, even if coercive, were not a violation of the Act.

Farmer chose to lay off McGuire, Parrish, and Rhodes, and Farmer informed the three that they were laid off effective at the end of that workday, due to lack of work.

That same day, Loftiss laid off driver Cecil, citing lack of work. Loftiss told Cecil that he would be contracting out the driving in the future, and asked Cecil if he would be interested in working on that basis. Cecil replied affirmatively, but no such arrangements were made.

Also on September 10, Loftiss went to the warehouse to see Mike Jones. Knowing that Company manager Farmer was resigning, Loftiss two days earlier had offered Jones Farmer's position. Jones then had said he would consider the offer. On September 10, Loftiss reiterated the offer. Jones asked for certain benefits; Loftiss responded with a counteroffer which Jones rejected. Loftiss then told Jones to post notice that the warehouse would be closed. Jones told Loftiss that he would continue in his present job working for a new manager, but Loftiss laid him off the next day, saying that if Jones thought he was worth more money, he should go out and find it.

In all, five employees were laid off: McGuire, Parrish, Rhodes, Cecil, and Mike Jones. Rain-Ware has not called any of these employees back to work.

On December 28, 1981, an administrative law judge (ALJ) found that the five layoffs and Farmer's September 9 contacts with employees violated subsections 8(a)(1) and (a)(3) of the Act. The Board affirmed the findings and conclusions of the ALJ and adopted his recommended order, except as

to Parrish, whose discharge was held lawful due to his supervisory status.[3] *See Rain-Ware, Inc.,* 263 N.L.R.B. 50 (1982).

II.

Rain-Ware objects that the substantial evidence on the record as a whole does not establish that the layoffs were motivated solely by discrimination to discourage union activity in violation of subsection 8(a)(3). The Company attributes the layoffs to economic necessity, caused by a decline in business. The Board argues that it has proved that anti-union animus was a substantial or motivating factor in the layoffs, and that the Company has failed to prove its affirmative defense that the layoffs would have occurred in any event for valid reasons.

The Supreme Court recently approved the Board's reformulation of the test for motivation in unlawful discharge cases.[4] *See NLRB v. Transportation Management Corp.,* — U.S. —, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). Under the current test, the General Counsel has the burden of proving that the employee's protected conduct was a substantial or motivating factor in the discharge. Even if the employer fails to rebut the General Counsel's proof, the employer could avoid being held in violation of section 8 "by proving by a preponderance of the evidence that the discharge rested on the employee's unprotected conduct as well and that the employee would have lost his job in any event." *Id.* at 2473.

---

**3.** Although the ALJ held that Parrish was a supervisor, he ordered reinstatement of Parrish along with the other four employees under Board precedent that the discharge of a supervisor violates the Act when it is an integral part of an employer's pattern of unlawful conduct. The Board, however, overruled that precedent in *Parker-Robb Chevrolet, Inc.,* 262 N.L.R.B. 402 (1982), *enforced sub nom. Automobile Salesmen's Union v. NLRB,* 711 F.2d 383 (D.C.Cir. 1983), holding that the Act's protection does not extend to supervisors discharged due to union activity. The Board applied *Parker-Robb* to reject that much of the ALJ's decision which held Parrish's discharge unlawful and ordered his

reinstatement. Parrish's lawful discharge is not an issue in this appeal.

**4.** The Board announced the new test in *Wright Line,* 251 N.L.R.B. 1083 (1980). The First Circuit enforced *Wright Line* with a change in the employer's burden of proof. *See NLRB v. Wright Line,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). The Supreme Court rejected the First Circuit's change and adopted the Board's *Wright Line* test in *NLRB v. Transportation Management Corp.,* — U.S. —, 103 S.Ct. 2469, 2474–75, 76 L.Ed.2d 667 (1983).

The Board has sustained its burden of proving that protected conduct was a motivating factor in the layoffs. The timing of the layoffs and warehouse closing provides the strongest support for connecting anti-union sentiment with the layoffs. The Company received the union demand letter on September 9; the Company laid off three employees (excluding Parrish) on September 10 and one on September 11. Timing alone may suggest anti-union animus as a motivating factor in an employer's action. *See NLRB v. Industrial Erectors, Inc.*, 712 F.2d 1131, 1137 (7th Cir.1983); *NLRB v. Gogin*, 575 F.2d 596, 601–02 (7th Cir.1978).

Furthermore, Farmer's encounters with employees revealed his perception of the probable Company reaction to the union activity. As we hold that Farmer, although he already had tendered his resignation, either was speaking directly for management or was relating his knowledge of Loftiss' position, Farmer's statements corroborate the suggestion that anti-union sentiment was a motivating factor for the layoffs.

The Company asserts that legitimate economic reasons rather than union activity prompted the layoffs and the closing of the warehouse. We are not convinced that the business decline cited by the Company was so drastic or so markedly different from prior declines as to compel an inference that the decline was the actual motive for the mass layoffs and warehouse closing. The Company's documentary evidence of its economic situation was not particularly enlightening. The ALJ, carefully analyzing the Company's gross sales figures from June 1979 and its unaudited monthly income statements from December 1979, found no particular trend. The Company's sales had suffered declines in the past, with no layoffs resulting. Inconsistent responses to two periods of decline provide evidence of a § 8(a)(3) violation. *See Industrial Erectors*, 712 F.2d at 1139–40; *NLRB v. Teknor-Apex Co.*, 468 F.2d 692, 694 (1st Cir.1972) (per curiam); *NLRB v. Lively Service Co.*, 290 F.2d 205, 207–08 (10th Cir.1961).

Loftiss testified that he had made plans to close the warehouse and cut the work force prior to receipt of the union demand letter on September 9.[5] Much of Loftiss' testimony either directly contradicted or was not supported by other testimony. The ALJ expressly found much of Loftiss' testimony "unreliable," and concluded that "none of Loftiss' testimony on any crucial point in this case is believable."[6] The presentation of implausible or shifting explanations for the alleged violation is a factor suggesting discrimination against union activity. *Industrial Erectors*, 712 F.2d at 1137; *NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d 613, 626 (7th Cir.1981).

The Company argues, as further evidence of a lawful motivation for laying off employees due to economic necessity, that it did not replace the laid-off production

---

5. The Company offered a September 3 letter from the Company accountant to the warehouse landlord as evidence of an earlier intention to execute the September 10–11 changes. In this letter, the Company gave 90 days' notice, as required in the lease, of an intent not to renew, and offered to vacate the premises prior to expiration of the lease if the landlord so requested. While the letter may document Loftiss' plan to close the warehouse eventually, Farmer testified that no closing date had been discussed until Loftiss abruptly ordered closure on September 10, one day after receipt of the union demand letter. The Company continued to pay rent on the warehouse after the September 10 closing.

6. Where the Company accountant's and Farmer's testimony corroborated Loftiss', the ALJ found that they "either speculated on Loftiss' reasons or accepted the pretextual reason offered by him." The Company raised before the Board its objections to the ALJ's allegedly erroneous findings on credibility, and general bias and prejudice against the Company. The Board declined to upset the ALJ's findings. We see no reason to do otherwise, and we view the testimony in that light. The ALJ and the Board make the credibility determinations, and a reviewing court will overturn such determinations only under exceptional circumstances. *NLRB v. Berger Storage & Transfer Co.*, 678 F.2d 679, 687 (7th Cir.1978).

employees,[7] and that the remaining employees testified that they were not busy after the layoffs. The post-termination evidence does not establish an economic justification for the layoffs. The economic situation prior to and at the time of the layoffs is critical, rather than that subsequent to the layoffs. While the ALJ found that "[p]erhaps there was some fat in the work force prior to the layoffs," the employees did testify that they were busy prior to the layoffs.

 The Company argues further that the retained employees also had supported the union. It is irrelevant that some union sympathizers were not laid off, when the layoffs were meant to chill union activity. *Majestic Molded Products, Inc. v. NLRB,* 330 F.2d 603, 606 (2d Cir.1964). Further, where a layoff en masse is made in response to union activity, the Board does not have to prove an anti-union motive as to each laid-off employee. *Rich's Precision Foundry,* 667 F.2d at 628.

 Finally, the Company notes that it told the laid-off employees that the reason for their layoffs was lack of work, and gave all employees favorable recommendations which cited a slowdown in business as the reason for termination. These severance procedures will not counteract the apparent illegality of the layoffs. The Company's arguments, taken altogether, did not demonstrate by a preponderance of the evidence that the layoffs would have occurred for a valid reason despite the union activity. The substantial weight of the evidence supports the Board's decision. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

### III.

 The Company objects to the ALJ's conclusion, adopted by the Board, that Mike Jones was not a supervisor. The Act defines a supervisor as:

[A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11) (1976). The Board and the courts have held that an employee need manifest one or more of these indicia to be held a supervisor, *see, e.g., Wisconsin River Valley District Council of the United Brotherhood of Carpenters v. NLRB,* 532 F.2d 47, 50 (7th Cir.1976); *Continental Insurance Co.,* 169 N.L.R.B. 600, 602 (1968), and thus to be outside the Act's protection from discipline or discharge for union activity, *Parker-Robb Chevrolet, Inc.,* 262 N.L.R.B. 402, 402 (1982), *enforced sub nom. Automobile Salesmen's Union v. NLRB,* 711 F.2d 383 (D.C.Cir.1983).

The Company describes Jones' responsibilities as keeping the keys, supervising and guiding the loading and transfer of goods, conducting sales out of the warehouse, and handling money. In addition, the Company notes that Jones had been offered the job of Company manager. While the Board concedes that Jones sometimes gave directions to other employees who helped him unload trucks, the Board maintains that Jones was not a supervisor.

 Jones was the only employee in the warehouse. He had no supervisory, disciplinary, or hiring and firing responsibility over any of the other employees. Such responsibility is critical to meet the statutory definition of a supervisor. *See NLRB v. Berger Transfer & Storage Co.,* 678 F.2d 679, 688 (7th Cir.1982). The Board was within its discretion to hold that Jones was not a supervisor; its decision is supported by the substantial evidence. *See id.* at 687.[8]

---

**7.** The delivery truck driver, Cecil, was replaced by a driver who worked on a mileage and per diem basis. Cecil had offered to work on such a basis, yet the Company did not rehire him.

**8.** The Company further argues that Mike Jones'

## IV.

■ Rain-Ware's final objection to the Board's decision asserts that the substantial evidence does not support the finding that the Company threatened and coercively interrogated its employees in violation of subsection 8(a)(1). With minimal discussion the ALJ concluded, and the Board adopted his decision, that the Company violated subsection 8(a)(1) when Farmer told employees that Loftiss would or probably would move the business to Florida, and when Farmer questioned Cecil about the union demand letter.

As to the statement that Loftiss would move the business to Florida, the Company attempts to cast doubt that the statement was made at all. The Company points out that although Farmer was called as the General Counsel's witness and was no longer employed by Rain-Ware, he was not questioned about this statement. Employees Parrish and Rhodes[9] did testify as to the statement; Smith, who was also on the loading dock at the time, testified that he did not hear anything. The General Counsel's failure to direct questions about the statement to Farmer, the speaker, does not resolve this matter in the Company's favor. The Company offers no persuasive argument that Farmer did not make the threat or that Farmer did not speak for management.[10] The statement clearly was a threat rather than a prediction relaying a basis in objective facts and conveying probable consequences beyond the employer's control. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618–19, 89 S.Ct. 1918, 1942–43, 23 L.Ed.2d 547 (1969); *Berger Trans-*

*fer*, 678 F.2d at 690; *Rich's Precision Foundry*, 667 F.2d at 623. *Cf. NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1368 (7th Cir.1983). We do not see fit to disturb the holding that the threat violated § 8(a)(1).

■ As to Farmer's question addressed to Cecil in the lunchroom concerning the union demand letter, the Company here too attempts to raise doubts that the exchange took place at all. The ALJ, in the best position to judge credibility, found Cecil's testimony was credible. Cecil testified that Farmer told him Loftiss had received a letter from the union, and asked Cecil what he knew about it. Cecil responded that he was not at liberty to discuss the matter. An evaluation of whether this interrogation reasonably could be considered coercive requires the court to view the questioning from an employee's perspective. *See First Lakewood Associates v. NLRB*, 582 F.2d 416, 418–19 (7th Cir.1978).

■ We must treat the questioning as coercive not only if it actually produced a coercive effect, but also if it had the tendency to produce a coercive effect. *NLRB v. Gold Standard Enterprises, Inc.*, 679 F.2d 673, 676 (7th Cir.1982). That an interrogation about protected activity is not accompanied by assurances against reprisal is evidence that it is coercive, and that the employee responds with lies or non-committal answers reflecting anxiety or fear is further evidence of coercion. *NLRB v. Ajax Tool Works, Inc.*, 713 F.2d 1307, 1314 (7th Cir.1983); *Jays Foods, Inc. v. NLRB*, 573 F.2d 438, 444 (7th Cir.), *cert. denied,*

termination was a "voluntary quit" rather than a layoff, because Jones rejected Loftiss' offer to replace Farmer as Company manager. We are not persuaded that Jones' rejection of the offer, followed by his statement that he would continue to work under a new manager, can be translated into a resignation rather than a discharge.

**9.** Rain-Ware tries to discredit Rhodes' testimony due to a minor discrepancy with Parrish's testimony as to the content of Farmer's statement on the dock; and to discredit Rhodes as a witness altogether due to Rhodes' statement on an employment application that the Company's business had closed. Rain-Ware fails on both counts; these minor discrepancies are too in-

substantial to discredit Rhodes' testimony, particularly when the ALJ, in the best position to assess credibility, expressly credited Rhodes' testimony.

**10.** On or before September 8, Farmer had given the Company notice of his resignation, and at least Mike Jones knew of the resignation because Loftiss had offered him Farmer's job. Rain-Ware does not argue that Farmer did not speak for the Company in making this or any other statement to employees, and the employees reasonably could believe Farmer was speaking for Loftiss.

439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978). *Cf. NLRB v. Acme Die Casting Corp.*, 728 F.2d 959 (7th Cir.1984) (dictum) (expressing doubt that a lie in response to interrogation should be treated as evidence of coercion, in case where employee either failed to understand the question or was brazen enough to both lie and later solicit union activity in the questioner's own office).

Unlike the situation in our recent case, *Acme Die Casting*, which held non-coercive questioning that occurred months before the company manifested any hostility toward union activities, here Farmer questioned Cecil the same day he received the union demand letter and threatened other employees with closure, and one day before the layoffs began. Farmer, the Company manager who was viewed as speaking on behalf of Loftiss, offered no assurances against reprisals, and Cecil responded with a non-committal answer. Farmer's remarks were more than casual when seen from Cecil's perspective, and constituted coercive interrogation.

### V.

We enforce the Board's order in full.