**MISSOURI PORTLAND CEMENT COMPANY, Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

Nos. 91–1964, 91–2146.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1991.

Decided May 26, 1992.

Michael S. Mitchell, Stephen P. Beiser (argued), McGlinchey, Stafford, Cellini & Lang, New Orleans, La., for Missouri Portland Cement Co.

Jerry Hunter, Lisa N. Richardson (argued), N.L.R.B., Contempt Litigation Branch, Aileen A. Armstrong, Linda J. Dreeben, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., Joseph H. Solien, N.L.R.B., Region 14, St. Louis, Mo., for N.L.R.B.

Before BAUER, Chief Judge, EASTERBROOK and KANNE, Circuit Judges.

BAUER, Chief Judge.

If at first you don't succeed, try, try again. Most often, this proves to be good advice. But now and again it is most apropos when amended to, if at first you don't succeed, try, try again, somewhere else. The charging party in this case, Charles Johnson, could benefit from the maxim as amended.

Johnson's employment relationship with Missouri Portland Cement Company ("Missouri Portland" or "the company") began when the company hired him in January 1978 to work at its Joppa, Illinois plant. It ended in May 1984 when Missouri Portland's employees, after expiration of their collective bargaining agreement, called an economic strike of the company. During the strike the company hired permanent replacements; when it was over Johnson was not recalled to work. In March 1986 the plant closed, but reopened in April 1987 under new ownership. It was no longer a union facility. Johnson applied for employment immediately upon the plant's reopening. He was turned down. He applied again in the summer of 1988, and again was turned down.

In October 1988, Johnson applied to Defender Industries ("Defender"), a subcontractor that provides Missouri Portland with workers to perform janitorial and housekeeping services at the Joppa plant. Defender offered him a position as a laborer, which he accepted. Then, in the spring of 1989, Johnson learned of an opening with Missouri Portland. For the third time since the plant reopened in 1987 Johnson applied for a job with the company. And for the third time, he was turned down. So he continued his employment with Defender. Again, in August, Missouri Portland had a vacancy, this time for the position of material handler. Because the company's distribution manager, Douglas Burton, preferred to fill the vacancy with someone already working at the plant, he asked Robbie Robertson, Missouri's liaison with Defender, to give him a list of Defender's five best workers. When Johnson learned about the vacancy, he called Burton to find out how to get an interview. Burton explained that he couldn't because he wasn't on Robertson's list of Defender's five best employees.

Plant manager Max Frailey had the ultimate hiring authority for Missouri Portland's Joppa plant. Burton recommended he hire Darrell Logeman, whose name appeared first on Robertson's list. Frailey accepted the recommendation and hired Logeman. After this fourth rejection by

Missouri Portland, Johnson filed a charge with the General Counsel of the National Labor Relations Board, who issued a complaint against the company. The complaint alleges that the company's latest refusal to hire Johnson was because of his concerted activities as a member of Local 438, United Cement, Gypsum and Lime Workers Division of International Brotherhood of Boilermakers, Iron Ship Builders, Forgers and Helpers, AFL–CIO ("Local 438"). Local 438 represented Missouri Portland employees until the strike in 1984 that resulted in many of its workers, Johnson included, being permanently replaced. Johnson maintained his membership in the union even though it no longer represented Missouri Portland employees. In fact, at the time of these events he was Local 438's recording secretary and production steward.

The matter was heard by an Administrative Law Judge ("ALJ") who, by his Decision and Order of April 24, 1990, determined that Missouri Portland violated Sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3). Among other things, the ALJ ordered Missouri Portland to hire Johnson. The company excepted to the ALJ's decision. On March 29, 1991 the National Labor Relations Board ("the Board") issued its Decision and Order adopting the ALJ's findings and conclusions. Missouri Portland then filed an application for review of the Board's Order with this court, and the General Counsel cross-filed for enforcement of that Order. For the reasons that follow, we deny enforcement of the Order of the National Labor Relations Board.

## I.

Under § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), an employer engages in an unfair labor practice if it interferes with, restrains, or coerces employees who exercise their rights under § 7 of the Act. Section 7 protects employee involvement in concerted activities, most notably labor organizations. 29 U.S.C. § 157. Before the ALJ, the General Counsel claimed that Missouri Portland's motivation to refuse to hire Johnson was that

he engaged in protected activities. Missouri Portland countered that its decision not to hire Johnson was based purely on sound business reasons unrelated to any protected concerted activity in which Johnson may have engaged.

Because of these conflicting claims, this case is governed by *NLRB v. Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced on other grounds*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). Under *Wright Line*, the General Counsel carries the burden of showing by a preponderance of the evidence that Missouri Portland's action was motivated in any way by a desire to impede protected concerted activity. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 399, 103 S.Ct. 2469, 2473, 76 L.Ed.2d 667 (1983). If he succeeds, the company then has the burden of showing, also by a preponderance, that it would not have hired Johnson even if he had not participated in protected activity. *Id.* at 400, 103 S.Ct. at 2473. We review the Board's findings and conclusions to determine if they are supported on the record as a whole by substantial evidence. *Universal Camera Co. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 463–65, 95 L.Ed. 456 (1951). Only when we are unable conscientiously to find that the evidence in support of the Board's decision is substantial when viewed against the record as a whole, which includes all of the evidence offered in opposition to the Board's view, may we set aside the Board's decision. *National By–Products, Inc. v. NLRB*, 931 F.2d 445, 451 (7th Cir.1991). Credibility determinations may be overturned only in the most extraordinary cases, as where the Board utterly disregards sworn testimony. *Stripco Sales, Inc. v. NLRB*, 934 F.2d 123, 125 (7th Cir.1991).

Assuming, without deciding, that the General Counsel met his *Wright Line* burden, we hold that the Board's determination that the company failed to meet its correlative burden is not supported by substantial evidence. Central to our decision is (1) the ALJ's erroneous reading of a critical piece of evidence offered by the

company, an error the Board dismissed as minor, and (2) the Board's mischaracterization of the testimony of the company's distribution manager Douglas Burton, testimony about which the ALJ made no credibility determination at all, and its total disregard of the testimony of Max Frailey, the plant manager.

## II.

Through Frailey's testimony, the company introduced an employee evaluation chart. Before the plant reopened in April 1987, Frailey anticipated that many of Missouri Portland's former employees would seek reemployment. For that reason, he and Jack Hearn, vice-president of industrial relations, prepared an evaluation chart for the plant's pre-closing hourly workers. The chart contains general information for each employee as well as a variety of rating criteria. Frailey and Hearn reviewed the personnel files of each employee to fill in the information on the chart, but Frailey, alone, filled in the "Comments" and "Rating" sections. Transcript ("Tr.") at 56. The ratings range from 1 (low) to 10 (excellent), with 5 the average. *Id.* Frailey testified that of the sixty former employees who received a rating of "4" or less, none was rehired. *Id.* Johnson received a rating of 4. The comments offered for Johnson are that he possesses poor skills, lacks ambition, and has a poor attitude. Respondent's Exhibit 2, at 7.

The company offered this chart not as an explanation for its failure to hire Johnson in August 1989, but to show that he had a history with the company, and based on that history it would not hire Johnson at any time. Frailey testified that while Johnson was employed at the plant, Frailey held many different positions that allowed him to move around the plant, and that he had opportunities to observe Johnson at work. Tr. 52. He stated that the chart reflected his opinion about Johnson at the time he prepared it, and nothing had occurred in the intervening time to change his mind about Johnson. Tr. 56.

The ALJ, although making no credibility determination about Frailey's testimony, disregarded his testimony that the rating scale ranged from 1 to 10 with 5 as average. He concluded, based on no articulated evidence, that "employees were rated on a scale of 2 to 8, rather than a scale of 1 to 10 as contended by respondent in its brief.... [Missouri Portland] arbitrarily chose to call employees with a rating of 5 average employees, rather than according that designation to employees with a median rating of 4." ALJ's Decision and Order ("ALJD") at 10. As further reasons for giving the chart little weight, the ALJ noted that: (1) of the 160 pre-strike employees rated on the chart, 60 (more than one-third) were rated 4 or below; (2) subjective factors, such as attitude, were considered as well as objective factors; and, (3) Frailey did not personally supervise the work of the employees he rated. *Id.* at 10–11.

The Board corrected the ALJ's misstatement of the rating scale, but stating it was a minor error, determined it did not affect the validity of his decision. Board's Decision and Order ("BD") at 1, n. 1. We disagree. The entire thrust of the company's case was to show that Johnson was a below average employee who would not be hired under any circumstances. The ALJ, however, converted Johnson from a below average employee to an average employee. Then, having corrected the ALJ, the Board also ignored this strong evidence that Missouri Portland considered Johnson to be a below average worker long before August 1989.

Moreover, although the ALJ found it significant that 60 of the 160 pre-strike employees were rated 4 or below, neither he nor the Board addressed to our satisfaction the fact that not one of them was rehired by the company, not just Johnson. That the company rehired only employees rated 5 or above simply proves out the company's assertion that it used the chart to rehire only the best workers. The company argues to us that because it lost money, closed, and ultimately was sold, it should have come as no surprise that when it reopened it would not rehire all of its former employees. That argument is borne out by the testimony of Max Frailey, who

testified that before the plant closed in 1984, it employed 158 people, and as of the date of his testimony, December 1989, the plant employed 108. Tr. 45. Not in a position to rehire all of its former employees, the company needed something to guide it in its rehire decisions. The chart provided that guidance.

Further, we see nothing suspicious about the company's reliance on the subjective as well as objective factors listed on the chart. When it reopened, the company was entitled to hire the most capable, willing, and cheerful workforce it could put together. In addition to ability, attitude is a valid employment criterion. *See, e.g., New York Telephone*, 300 NLRB No. 121, 136 LRRM 1237, 1239 (Dec. 14, 1990). Finally, as to Frailey's familiarity with the work of the employees he rated, although he did not personally supervise each, he testified that through the years he held several positions with the company, which allowed him the opportunity to observe the workers. In part, his comments and ratings on the chart were based on those observations. He also reviewed the personnel records of each employee, which most likely did contain remarks by the employees' supervisors. As a consequence, Frailey's comments and ratings are no less valid because he did not personally supervise the employees. Therefore, contrary to the Board, we determine that the chart was entitled to be considered as evidence in support of the company's contention it would not have hired Johnson under any circumstances.[1]

### III.

After his third unsuccessful application for re-employment at Missouri Portland, Johnson sought employment with Defender Industries. Missouri Portland distribution manager Burton was among those Johnson asked to recommend him to Defender.

Burton was aware of Johnson's abilities, having supervised him at the Joppa plant from 1980 to 1982. Although Burton's observation was that during that time Johnson exhibited a bad attitude, Johnson pleaded with him that he was a changed man with the added responsibilities of a family, and that he would do a good job for Defender. Attitude, Burton testified, is his most important hiring criteria: "So I look at a man's attitude and if I feel like he's a team player and wants to work, then I put a lot of importance to that." Tr. 69.

In addition to his former opinion about Johnson's work attitude, Burton had to overcome personal hard feelings toward Johnson because of an incident in November 1987. At the time, Burton and Charles Barfield, one of the plant foremen, were two of seven candidates running for three vacancies on the local school board. Johnson placed an ad in the newspaper that Local 438 supported three of Burton's and Barfield's opponents. When, eleven months later, Johnson asked for Burton's help in getting a job with Defender, Burton testified "it was difficult, in all honesty.... [I]t took some soul-searching." Nonetheless, Burton was able to put the incident behind him and recommend Johnson to Defender.

Ten months later, in August 1989, Johnson went to Burton to find out why he was not considered for the material handler position at Missouri Portland. Burton answered he was not on Robbie Robertson's list. As the department head, Burton had the responsibility to recommend to Frailey the employees he wanted for his department. Because he wanted to hire someone already working in the plant, Burton asked Robertson, who had daily contact with Defender employees, for a list of their five best workers. The first name on the list was Darrell Logeman. Burton knew Loge-

---

1. We note that on two earlier occasions when the company offered the chart for the same purpose it met with more success. In 1987, the union filed two separate unfair labor practice charges alleging, in part, that when it reopened the plant it refused to rehire certain of the pre-strike employees because of their union activity, Johnson among them. During the General Counsel's investigation into the charges, Frailey spent two days with an NLRB investigator going over the evaluation chart, explaining his reasons why the company did not rehire these employees. Tr. 56–57. As a result of the investigation, the General Counsel dismissed those charges against the company.

man to be a worker with a good attitude. At the time Logeman went to work for Defender, one of Logeman's former employers made the unsolicited comment to Burton that Logeman was one of the best workers that he ever had. Tr. 70. Based on that, Burton recommended Logeman to Frailey.

Had Johnson been on Robertson's list, Burton testified, he would not have recommended him for the job. Tr. 73–74. But, if by some stretch Johnson had made it onto Robertson's list and Burton had recommended him to Frailey, Frailey testified that he "probably wouldn't have allowed [Johnson to fill the position]. It would have taken a lot of arm-twisting for that to happen." Tr. 60. Frailey, recall, prepared the employee evaluation chart from his personal observation of pre-strike employees and from a review of their personnel files. He was familiar with Charles Johnson.

In the face of all of this uncontroverted evidence, the Board found Burton's testimony to be "suspect" because of the November 1987 incident. Because this finding is patently unreasonable and not supported by the evidence, we reject it. *Midwest Stock Exchange v. NLRB*, 635 F.2d 1255, 1265 (7th Cir.1980). Rather than casting suspicion on Burton's credibility, we think that his ability to set aside what we consider to be a personal dislike for someone, and recommend that person for a job, establishes his credibility. Further, the Board completely ignored Frailey's testimony, making no credibility determination about it whatsoever. Although the Board may dismiss or disregard uncontroverted testimony, it may not do so without a detailed explanation. *Id.* at 1261. We find none in this record.

In short, the Board either dismissed or ignored all of the evidence, overwhelming evidence, that Missouri Portland would not rehire Charles Johnson—under any circumstances, regardless of union affiliation or activity.

### IV.

We have reviewed the record in its entirety, and are satisfied that the company

presented sufficient evidence to meet its *Wright Line* burden. We cannot conclude, therefore, that the evidence in support of the Board's decision is substantial. For that reason, we DENY ENFORCEMENT, GRANT REVIEW, and VACATE the Order of the NLRB.