9 F.3d 113
 145 L.R.R.M. (BNA) 2200
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
OUTBOARD MARINE CORPORATION, Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.
 Nos. 92-2733, 92-3171.
 United States Court of Appeals, Seventh Circuit.
 Argued May 6, 1993.
Decided Oct. 13, 1993.
 
 Before CUDAHY, COFFEY and MANION, Circuit Judges.
 
 ORDER
 
 1
 The National Labor Relations Board found that Outboard Marine Corporation committed a plethora of unfair labor practices. Among the many findings against it, Outboard challenges only three: whether Outboard improperly hired too many permanent replacements; whether it delayed recalling the economic strikers; and whether it improperly withdrew recognition of the union after a decertification petition. We conclude that the record shows substantial evidence supporting the Board's decisions, and accordingly enforce.
 
 I. Facts
 
 2
 Outboard manufactures and distributes recreational marine products. This case focuses in particular on its Calhoun, Georgia manufacturing plant that produces outboard motors. On April 18, 1985, after a Board-conducted election in which a majority of production and maintenance employees elected the Laborers' International Union of North America, Local Union 752 (the Union) as their collective bargaining representative, the Union was certified. But Outboard had a long history of opposing unionization of the Calhoun plant. Beginning in November 1984 Outboard was alleged to have made numerous threats of plant closure, the loss of jobs if a strike occurred, the futility of supporting the Union, and future unfavorable recommendations. While each side casts a different light on this confrontational period, Outboard has chosen not to appeal many of the Board's findings. Although contested before the ALJ and the Board, we recite facts that are essentially uncontested on appeal.
 
 
 3
 In the months following the Union's certification, the parties negotiated on a contract. Continued animosity seemed to dominate these negotiations. Supervisors Steve Fowler and Howard Gallman warned employees of the futility of their support for the Union and their possible engagement in a strike. Manager Ronald Tetzlaff and Supervisor George Hutchinson predicted that the plant would close if a strike occurred. Production Manager Terry Fulmer speculated that other employers would not hire the strikers. The Board saw these incidents in the context of threats. Fulmer also offered a supervisor's position to the Union's chief steward, Ray Moore, if he would assist Outboard in getting rid of the Union. Plant Manager John Florip admonished the employees regarding the futility of supporting the Union, that no contract would ever materialize, and that if they went on strike, they would lose their jobs and not work anywhere in the community.
 
 
 4
 During this time period, the Union was not Outboard's only concern. Although it is the world's largest producer of outboard motors, Outboard faced stiff, world-wide competition. It originally designed the Calhoun plant to manufacture motors on a computerized, continuous conveyor, hoping to produce more than 1,200 motors per day. But production never came close to that goal. While Japan-made motors averaged one defect per three motors, some evaluations showed Calhoun experiencing as many as twenty defects per motor. Thus, the contract negotiations occurred against the additional pressure of failures in a costly program which was designed to revamp the Calhoun manufacturing process and to make it more competitive.
 
 
 5
 As the months went by, contract negotiations did not progress. On January 6, 1986, after twenty negotiating sessions had produced few positive results, the Union declared a strike for January 15. Approximately a week before the planned strike, Supervisors Gallman and Hutchinson again warned employees with the loss of their jobs and benefits and unfavorable recommendations to prospective employers if they went on strike. Outboard has not contested the Board's finding that these direct confrontations with employees violated section 8(a)(1) of the National Labor Relations Act (NLRA),[1] 29 U.S.C. Sec. 158(a)(1).
 
 
 6
 On January 14, 1986, one day before the scheduled strike, the Company proposed a complete contract to the Union during the bargaining session. After reading the document, the Union asked to reconvene (by this time it was late in the evening). The parties briefly discussed a dues check-off provision and the contract's duration. However, Jim Miles, Outboard's chief negotiator, had had enough. When the Union presented a counter-proposal, Miles stated the negotiations were at an impasse. Although the Union negotiator insisted they were not at impasse, Miles claimed he was too tired to continue, and left the meeting. As planned, on January 15 the employees went on strike. As an immediate response, Outboard implemented the wage and benefit increases contained in their last contract proposal. Outboard does not contest the Board's findings that its actions in declaring an impasse when none existed and its unilateral implementation of compensation increases violated section 8(a)(5).
 
 
 7
 The strike was short-lived. In less than a week, on January 21, 1986, the Union accepted Outboard's contract terms previously presented and unconditionally offered to return to work. The circumstances, however, had changed dramatically. On January 15, when the strike commenced, Outboard had been employing 185 production and maintenance workers. Of those, 103 went on strike while the rest stayed on the job. By January 20, Outboard had recalled approximately 30 non-striking, previously laid-off employees and hired 115 additional permanent replacements, bringing the total complement to 231 employees. Apparently because this number was more than before the strike, the strikers' offer to return to work resulted in their merely being placed on a preferential hiring list.
 
 
 8
 During the short strike, Outboard continued to pressure Union supporters. As stated previously, Outboard does not contest the Board's finding that prior to the strike Supervisor Hutchinson threatened employees not only with the loss of their jobs and benefits but also with unfavorable recommendations to prospective employers if they went on strike. One of those employees was Eunice Darlene Rayburn. Soon after the strike was underway, she spoke with Hutchison concerning the possibility of her returning to work. He stated that Outboard did not "want[ ] anyone there with a union card." Plant Manager Florip told the picketing strikers, "Well it's going to be a cold day in hell before you get a contract." In addition to these uncontested violations of the NLRA section 8(a)(1), the ALJ and the Board also found that on January 20 Outboard hired at least ten new employees rather than several strikers, including Rayburn, who had shown up at 7:00 that morning offering to return to work. They were sent home at noon, being told that they had been replaced.
 
 
 9
 Within a month after the strike, in February 1986, Supervisor Bo Harris spoke with an out of work striker at a local supermarket and, in a sarcastic tone, told her not to count on being recalled because Plant Manager Florip had hired fifty extra replacement employees. (In the Spring of 1986, Plant Manager Florip was replaced by Sam DeFalco.) Beginning that fall, Plant Manager DeFalco held informal luncheon meetings with several employees (at that time approximately ten strikers had been recalled). He stated that the preferential hiring list would expire by its own terms in January 1987. He also stated that Outboard could sell all the V-8 motors it could produce but that this would require an increase in production and "he couldn't get the people right now." DeFalco stated that "he wanted to hire at least 150 to 200 people to get out around 1200 motors, if he could" and that if employees "would just hang on until January, it would be awfully cold for the ones on the street, and awfully warm inside." DeFalco also remarked that he could not hire additional people right away; but after the preferential hiring list expired, "He would look at a few but it would be a few. That he understood that some people got caught up in the flow of things." He told the employees that Outboard could not give them a wage increase at the time "because we had a third party."
 
 
 10
 Based on this evidence, the Board found that DeFalco mistakenly believed the preferential hiring list would expire in January 1987 and that, although needed, Outboard would not hire additional employees until then. Despite a reduction in Outboard's work force after the strike, it re-hired only ten of the strikers in the following year. The Board also found that DeFalco's comments were designed to promise greater benefits if the employees got rid of the Union.
 
 
 11
 In August 1986 Supervisor Todd Nicholas told one of the recalled strikers that the January 1986 contract which would expire in January 1987 also would give Outboard the opportunity to decertify the Union. In October 1986 a decertification petition was circulated. Nicholas told the recalled striker that Outboard had the list and would know who had and had not signed the petition, and that the Union did not exist any longer. On October 23 and 24, 1986, Outboard received a decertification petition signed by a majority of the production and maintenance employees. On January 21, 1987, when the contract expired, DeFalco held a plant-wide meeting and announced that the plant was now union-free and that "it was going to stay that way for as long as he was there and that he was going to be there for a long time." He announced salary and benefit increases, announced increases in production and overtime, and had the employees remove the Union bulletin board. When he testified, DeFalco did not deny that he made any of these statements.
 
 
 12
 In the fifteen months that followed the strike, 125 employees departed for various reasons, yet Outboard rehired only ten replacements from the recall list. It did not begin to recall a substantial number of strikers until April 1987. From April to September, Outboard rehired sixty from the recall list; all who previously went on strike were recalled by October. The Board took particular interest in management's treatment of several returning employees. Manufacturing Manager Ronald Tetzlaff told employee Connie Davis to impose more strenuous working conditions on Reba Cook because of her union support (Cook was on the Union negotiating team and was now its chief steward). Within a short time Tetzlaff was also threatening reprisals against Davis, suspecting her of supporting the Union. When Cook returned to work, Plant Manager DeFalco told her "that there was not a union at [Outboard] and there was not going to be a union here." DeFalco told another returning striker that "there was not a damn union here and there never would be a damn union here." Again, DeFalco did not deny any of these statements.[2]
 
 
 13
 In this enforcement proceeding Outboard argues only that it did not violate section 8(a)(3) by hiring too many striker replacements, or by delaying the recall of strikers, nor section 8(a)(5) by withdrawing recognition from the Union based on the decertification petition.
 
 II. Discussion
 
 14
 Our standard of reviewing the Board's decisions is well settled and entirely deferential. We will uphold the Board's findings if supported by substantial evidence, which is such evidence that a "reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); see Randall Div. of Textron, Inc. v. NLRB, 965 F.2d 141, 144 (7th Cir.1992). We will uphold the Board's legal conclusions "unless they are irrational or inconsistent with the [NLRA]," Randall, 965 F.2d at 144. Accordingly, we will uphold those conclusions if they "have a reasonable basis in the law," NLRB v. Augusta Bakery Corp., 957 F.2d 1467, 1471 (7th Cir.1992). See NLRB v. Shelby Memorial Hosp. Assoc., No. 92-1285, slip op. at 3-4 (7th Cir. Aug. 2, 1993).
 
 
 15
 In order to show a violation of section 8(a)(3), the General Counsel must prove that Outboard was motivated by anti-union animus in discriminating against an employee regarding any term or condition of employment; "that the employee's protected conduct was a substantial or motivating factor in the adverse action." NLRB v. Transportation Mgt. Corp., 462 U.S. 393, 401 (1983); U.S. Marine Corp. v. NLRB, 944 F.2d at 1315. In determining motive, the Board may rely on direct or circumstantial evidence. Midwest Stock Exchange v. NLRB, 635 F.2d 1255, 1259 (7th Cir.1980).
 
 
 16
 Outboard argues that even where the Board shows anti-union conduct, "if an employer presents record evidence that it was motivated by legitimate objectives, the burden shifts to the NLRB to prove pretext." This ignores the employer's burden. Where substantial evidence shows that the employer was motivated by anti-union animus, it can avoid liability by proving, as an affirmative defense, that it would have taken the same action anyway. Transp. Mgt., 462 U.S. at 401-404; Missouri Portland Cement Co. v. NLRB, 965 F.2d 217, 219 (7th Cir.1992). Merely presenting evidence that it was otherwise motivated is not enough. Missouri Portland, 965 F.2d at 219 ("only when we are unable conscientiously to find that the evidence in support of the Board's decision is substantial when viewed against the record as a whole ... may we set aside the Board's decision." Outboard has presented no support for such a proposition.
 
 
 17
 The parties do not dispute that an employer faced with an economic strike may permanently replace the strikers in order to continue production. But the burden is on the employer to prove that it hired permanent replacements for a substantial business justification, such as to continue production. NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378-79 (1967); Giddings & Lewis, Inc. v. NLRB, 710 F.2d 1280, 1285 (7th Cir.1983). If an employer appears to have delayed recalling strikers in order to defeat the union, the employer must justify its actions with a substantial business decision. Giddings, 710 F.2d at 1285 (requiring the employer to explain away "any procedure which threatens" the strikers' protected rights); NLRB v. Rain-Ware, Inc., 732 F.2d 1349, 1353-54 (7th Cir.1984).
 
 
 18
 A. Finding of Anti-Union Animus in the Hiring of Excess Replacements
 
 
 19
 Before the strike was over, Outboard had hired nearly fifty excess replacements. This obviously hurt the strikers' opportunity to be recalled once the strike was over. The General Counsel argued that Outboard discriminated against the strikers because of anti-union animus. Outboard responded that it had no such motive. Rather, it was motivated by legitimate business objectives; namely, the need for satisfactory production and profit.
 
 
 20
 In determining whether anti-union animus contributed to Outboard's discrimination against the strikers, the Board can consider Outboard's knowledge and statements as well as the record of hostility and coincidences in timing. See NLRB v. Industrial Erectors, Inc., 712 F.2d 1131, 1137 (7th Cir.1983). "Timing alone may suggest anti-union animus as a motivating factor in an employer's actions." Rain-Ware, 732 F.2d at 1354.
 
 
 21
 The ALJ initially noted the high number of section 8(a)(1) violations, which Outboard does not now contest. In addition, although Outboard had entered into two settlement agreements regarding many of the early violations, the Regional Director set aside the agreements because of Outboard's continued violations of the employees' protected union activities. In addition to Outboard's threats of futility, job loss, and promises of benefits to those who chose not to support the Union, the ALJ noted that Outboard's course of bargaining also supported a finding of anti-union animus. The timing of Outboard's actions also supported a finding of unlawful motivation. It rushed to advertise for and employ new workers; in less than one week Outboard had employed an unprecedented number.
 
 
 22
 Based on the above facts, the Board concluded that anti-union animus was a motivating factor in Outboard's hiring excess striker replacements. The Board viewed the evidence in the context of a high number of unfair labor practices. Outboard hired large numbers of replacements, many of them in the waning days of the short strike when some strikers were inquiring about returning to work. The Board noted that several managers and supervisors now admit to compromising the employees' protected rights before, during and after the representation election, and before, during and after the strike.
 
 
 23
 Outboard argues that standing alone, section 8(a)(1) violations do not prove unlawful motivation in section 8(a)(3) cases. See Midwest Stock Exchange, 635 F.2d at 1264. But here the Board was warranted in relying on what it perceived to be Outboard's pitiful record. There is no need to try to keep track of the uncontested unfair labor practices. In looking to whether Outboard intended to defeat the entire Union by its hiring practices after the strike, the Board could and did consider how Outboard intended to defeat the Union one member at a time. Uncontested violations do not disappear from the case, but can place the disputed issues in context. U.S. Marine, 944 F.2d at 1314-15. Outboard apparently would prefer to isolate several findings that it considers defensible. But it cannot expect the Board to ignore the series of acknowledged violations that portray the context of the challenged issues. In this case the challenged section 8(a)(1) violations do not stand alone.
 
 
 24
 When the Union went on strike, Outboard immediately hired replacements. It had every right to do so. See NLRB v. Cutting, Inc., 701 F.2d 659, 662 (7th Cir.1983). But in less than one week, Outboard had not only replaced the strikers, but added nearly fifty "insurance" employees. This wholesale hiring provided a cushion for the inevitable rejection of a number of new hires. Immediately upon the Union's unconditional offer to return to work, Outboard ceased all hiring of replacements. The Board could conclude this was no coincidence. The Board could infer anti-union animus from Outboard's unusual timing. The General Counsel has carried his burden of proving that protected conduct was at least a motivating factor in hiring so many replacements so soon, and in not recalling the strikers for nearly a year and a half. While this may be enough to support the Board's conclusion, there is still more.
 
 
 25
 Outboard also declined to rehire experienced employees (strikers) who sought to return to work as the strike was waning but also while Outboard was still hiring replacements. Outboard argues that the record does not show that any strikers unconditionally offered to return to work. Even if true, the employer bears the burden of proof on this issue. See NLRB v. Augusta Bakery Corp., 957 F.2d 1467, 1472 (7th Cir.1992). It was for Outboard to prove, not the Board to disprove, that the strikers' offer to return on January 20 was unconditional. That it did not do. To the contrary, substantial evidence supports the Board's determination that the strikers unconditionally offered to return to work on January 20, yet were overlooked in favor of new employees.
 
 
 26
 Soon after the strike was underway, employee Rayburn spoke with Supervisor Howard Gallman. She testified "I asked him if I would come back, would I get the same benefits?" He said, "yes, and more. Probably about eight dollars." Shortly thereafter Rayburn spoke with Supervisor Hutchison. She testified "I was talking to him about a job. About coming back.... He told me to call John Stoy." She then telephoned Stoy's office--
 
 
 27
 "I talked to his secretary. I explained who I was and what I wanted. She told me ... Stoy was in a meeting, for me to report Monday at 7:00 o'clock.... We got there.... He said for us to report in the conference room. Me, ... and several others. We stayed there from 7:00 till fifteen to 12:00. And then a tall, skinny man with glasses, and a short guy with a white shirt, come in. He said that we had been replaced and that we was on call."
 
 
 28
 Vol. 6, p. 122-23. Against this testimony, Outboard argues that the record does not show that the "several" strikers unconditionally offered to return to work. To the contrary, Rayburn talked to Hutchison "about a job," was instructed to telephone Stoy and explained "what [she] wanted." This testimony and her arrival at Outboard on January 20 provide substantial evidence that what Rayburn wanted was her job. Since Outboard had unilaterally increased wages at the commencement of the strike, and Gallman had indicated that if she would return she would be paid more, there is no conceivable reason not to also infer that Rayburn's offer was unconditional. Outboard has asserted no reason for having them wait nearly five hours, only to declare them replaced.
 
 
 29
 Significantly, even as Rayburn and others waited in the conference room, it appears that Outboard was still hiring outsiders. Industrial Relations Manager Robert Earlie testified that "As I extended offers of employment to individuals and they accepted, I would have them sign this form and then I would sign as a witness." At least ten new employees signed such forms on January 20. Thus, inexperienced workers were being hired while several experienced strikers were waiting in the conference room offering to return.
 
 
 30
 Under these circumstances, we conclude that the record as a whole substantially supports the Board's conclusion that anti-union animus motivated Outboard's hiring of a substantial number of permanent replacements in order to avoid rehiring strikers.
 
 
 31
 B. Business Justifications for Hiring Excess Replacements
 
 
 32
 Notwithstanding any anti-union animus, Outboard argued that it had substantial business justifications for hiring excess replacements. The Board, however, rejected them.
 
 
 33
 Where, as in this case, substantial evidence shows that the employer was motivated by anti-union animus in hiring excess replacements, it bears the burden of proving sufficient business justification, such as hiring replacements in order to continue production. Fleetwood, 389 U.S. 375, 378-79 (1967); Giddings & Lewis, 710 F.2d at 1285. Outboard asserted several reasons for increasing its non-strike force by nearly fifty people. Outboard desired to maintain its current level of production. To this end, it anticipated that the productivity and efficiency of the new workers would be lower than its previously trained work force. It also anticipated high attrition among the new hires. Outboard also wanted to perform a mass training program which could not be repeated. Because it had no idea how long the strike would last, Outboard also desired to have too many rather than too few employees trained and ready to work.
 
 
 34
 These appear to be plausible business reasons. As management decisions, they give one account for why certain things were done. But the Board need not accept reasons why Outboard could have justified hiring so many replacements. Instead, it has to determine whether in fact they were the true reasons at the time the decisions were made. Although after the strike Outboard's productivity fell by one-half and some replacements did indeed quit shortly after being hired, the Board could have questioned whether Outboard foresaw such potential activity, or whether these justifications were made with the convenience of hindsight.
 
 
 35
 Outboard correctly notes and argues that the Board cannot simply disregard uncontroverted evidence in the record without a detailed explanation. See Missouri Portland, 965 F.2d at 222. In this case, however, it is Outboard that wishes to disregard the record. The question of timing lurks very much in the background of this case. Outboard was hiring replacements at a very rapid pace until the Union decided to return to work. Suddenly, all hiring stopped. The record contains no explanation. The Board noted that Outboard had presented no evidence that it sought to hire a predetermined number of replacements at the outset of the strike. Had there been such evidence, the coincidence of hiring "only" fifty extra people just as the strike ended could have influenced the Board. Without it the Board could reasonably infer that the company was hiring as many people as possible during the strike, then ceased hiring as soon as the next person hired had to come from the strike recall list.
 
 
 36
 Certainly if a company lost its entire regiment of experienced employees, it could have difficulty in determining the number of inexperienced replacements to consider hiring. But here again, Outboard advances no independent business reason, other than a desire for the finding to be overturned, for not hiring the strikers that showed up for work on January 20 and were sent home in favor of inexperienced replacements.
 
 
 37
 Outboard purported to hire so many permanent replacements in January 1986 because that was its "busy season" for the sale of outboard motors. The Board did not accept this explanation because after approximately one hundred replacements had thereafter left Outboard, it did not hire any additional employees in anticipation of the upcoming busy season of 1987. What Outboard did in fact do in 1987, however, is not determinative of its intentions in 1986. Outboard argues that the Board should have focused on what Outboard planned in 1986, without considering any changes in circumstances after that time. But here again, Outboard had to show that its busy season in 1986 was the real reason for hiring so many replacements. That it did not prove. The Board mentioned the lack of similar hiring in 1987 only to highlight the inconsistencies in Outboard's arguments.
 
 
 38
 The Board also noted that Outboard's assertions about a mass training for new employees was simply not true. The Board found that Outboard used similar teaching teams both before and after the strike and instructors remained at the plant for several weeks. The Board credited no evidence that Outboard had plans to change the procedure for this large batch of new hires.
 
 
 39
 Given the timing of Outboard's actions, the substantial number of unfair labor practices against individual employees, and the failure to hire strikers offering to return to work, while at the same time hiring inexperienced replacements, we conclude that the Board had substantial evidence to find that Outboard did not have any substantial business justification for hiring so many permanent replacements. Substantial evidence also supports the conclusion that Outboard based its hiring practices on its desire to rid itself of any Union involvement.
 
 
 40
 C. Finding of Anti-Union Animus by the Delay in Recalling Strikers
 
 
 41
 After the strike was over and the strikers were placed on a recall list, very few were recalled, even though many of the replacement employees had left. The Board found that Outboard delayed recalling the strikers out of anti-union animus. Outboard disputes this, and also offers a business justification--the revamping of its plant and the need for a higher quality product process.
 
 
 42
 Again, in determining whether anti-union animus contributed to Outboard's discrimination against the replacement rights of strikers, the Board can consider Outboard's knowledge and statements, the record of hostility and coincidences in timing. See Industrial Erectors, 712 F.2d at 1137. Timing alone may provide the necessary support for such a finding. Rain-Ware, 732 F.2d at 1354.
 
 
 43
 The ALJ found that because Outboard had not predetermined the number of employees it had planned to hire during the strike, Outboard acted unlawfully in stopping all hiring once it heard that the Union had accepted the contract. The Board noted that between the end of the strike on January 21, 1986 and April 1987, approximately 125 employees left Outboard. Yet Outboard hired only ten former strikers to replace them. The Board concluded that this was no coincidence. The long delay was consistent with the many anti-union statements found to violate section 8(a)(1), which Outboard does not contest on appeal.
 
 
 44
 The Board found that many of Outboard's supervisors and managers harassed and discriminated against the strikers before, during and after their recall, including unlawfully discharging one employee and warning several others. Replacements departed, production was low, yet Outboard still did not hire the strikers. As Outboard's own witness, Plant Manager DeFalco, stated, he could sell all the V-8 motors he could get, yet Outboard could not hire the necessary people until the preferential hiring list was over, and only then hire those employees that got "caught up in the flow of things," not the Union activists. Only when the Union filed the unfair labor practice complaint in April 1987 did Outboard suddenly begin to hire the strikers back. All had been rehired by that October.
 
 
 45
 Under these circumstances, we conclude that the record as a whole supports the Board's conclusion that there was substantial evidence of anti-union animus which motivated Outboard's delay in recalling the strikers.
 
 
 46
 D. Business Justifications for Not Recalling Strikers Sooner
 
 
 47
 Outboard argued that it had substantial business justifications for delaying the recall of strikers, and that anti-union animus was not a factor. Again, the Board rejected Outboard's explanations for its conduct.
 
 
 48
 As in hiring too many replacements, if an employer delays recalling strikers in order to defeat the Union, the employer must justify that business decision. Giddings, 710 F.2d at 1285; Rain-Ware, 732 F.2d at 1353-54. Outboard presented numerous reasons for not recalling the strikers sooner. The Calhoun plant had never reached its anticipated standards. The plant was inefficient and produced an inferior product, which resulted in dissatisfied customers and a lower demand. Plant Manager DeFalco shut down the plant for a day, cleaned up debris, and met with all employees regarding the need for better quality. Certain motors were even discontinued until the quality levels increased. In fact, the ALJ found that none of these process changes violated the NLRA. Thus, process changes did account for at least some of the downsizing of Outboard's work force. Outboard also noted that its inventory exceeded sales forecasts. From April 1986 to April 1987, as the quality of the production process increased, Outboard contends that fewer employees were necessary.
 
 
 49
 In contrast to the question involving whether Outboard hired an excessive amount of replacements, here the Board does not dispute the underlying facts as asserted by Outboard. The Board simply rejected them as the real reasons for not recalling the strikers. From January 21, 1986 to April 1987, over one hundred employees left Outboard and only ten strikers were recalled. The Board acknowledged that Outboard was redesigning its plant and was concerned about quality. But Outboard did not show the Board that it became indifferent to the quantity of motors it produced, nor did it prove any connection between the number of motors and the number of necessary employees. Improvements made it possible to produce more motors with fewer people; but the fact remains that the plant was producing far fewer motors than planned. Outboard left unchallenged Plant Manager DeFalco's statements that he could sell all the V-8 motors he could produce, yet Outboard could not hire the necessary people until the preferential hiring list expired, and only then hire those employees that got "caught up in the flow of things," not the Union activists. Such comments from the plant manager to the entire work force entitled the Board to conclude that substantial evidence indicated that anti-union animus caused Outboard not to recall the strikers sooner.
 
 E. Decertification Petition
 
 50
 Because of the unfair labor practices in this case, the Board's remedy included requiring Outboard to recognize the Union for one year, beginning on the date Outboard complied with the Board's orders. Outboard responds that it should not be forced to recognize a union that does not represent a majority of the workers.
 
 
 51
 A union retains its majority status for one year after its certification. See Randall Div. of Textron, Inc. v. NLRB, 965 F.2d 141, 145 (7th Cir.1992). Thereafter, it retains a presumption of such status until the employer shows good-faith reasons that the union no longer has a majority support. Id. An employer, however, cannot cause the majority's support for the union to crumble by committing unfair labor practices. See Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 687 (1944). In determining whether the employer's actions caused the Union to lose its majority, the Board has considered the following:
 
 
 52
 (1) the length of time between the unfair labor practices and the employee petition; (2) the nature of the unfair labor practices, including whether they are of a nature that would cause a detrimental or lasting effect on the employees; (3) the tendency of the unfair labor practices to cause employee disaffection with the union; and (4) the effect of the unlawful conduct on the employees' morale, organizational activities, and membership in the union.
 
 
 53
 Sullivan Industries v. NLRB, 957 F.2d 890, 899 (D.C.Cir.1992).
 
 
 54
 In the absence of a lawful impasse, the Board concluded that Outboard unilaterally increased wages, hired excessive permanent replacements, and delayed recalling the strikers. As early as August 1986 Supervisor Nicholas told one of the recalled strikers that when the January 1986-1987 contract expired, Outboard would seize the opportunity to decertify the Union. In October 1986 a decertification petition was circulated. Nicholas told the recalled striker that Outboard had the list and would know who had and had not signed the petition, and that the Union did not exist any longer. Also in the fall, Plant Manager DeFalco mistakenly thought that the preferential hiring list would expire by its own terms in January 1987, and that if the employees "would just hang on until January, it would be awfully cold for the ones on the street, and awfully warm inside." DeFalco also remarked that he could not hire additional people right away; but after the preferential hiring list was over, "He would look at a few but it would be a few. That he understood that some people got caught up in the flow of things."
 
 
 55
 What the Board concluded to be unfair labor practices occurred only months before the employee petition. On October 23 and 24, 1986, Outboard received a decertification petition signed by a majority of the production and maintenance employees. On January 21, 1987, when the contract expired, DeFalco held a plant-wide meeting and announced that the plant was now union-free and that "it was going to stay that way for as long as he was there."
 
 
 56
 The petition occurred after Outboard had hired excessive replacements, and while it was improperly delaying the return of the strikers. Thus, the Board concluded that through its unfair labor practices Outboard orchestrated the employee complement so as to defeat the labor rights of the Union and the employees. That Outboard implemented wage and benefit increases without bargaining with the Union also tended to cause employee disaffection with the Union. The Board's remedy in this case, to treat the initial year of certification as beginning on the date Outboard complies with the Board's order, is a reasonable solution. Outboard cannot commit what the Board found to be unfair labor practices with one hand and then expect the Board to accept a decertification petition from the other.
 
 III. Conclusion
 
 57
 Concerning the contested issues in this case, the Board concluded that anti-union animus motivated Outboard's decisions to hire excess replacements and delay recalling the strikers. Outboard, in turn, failed to convince the Board that it needed the replacements to maintain its production process and that it failed to recall even more employees because of concerns over production quality. Substantial evidence supports these conclusions. We also refuse to substitute our judgment for that of the Board's in assigning the appropriate remedy in this case. Thus, the initial year of the Union's certification should begin when Outboard complies with the Board's order. The Board's order is in all respects,
 
 
 58
 ENFORCED.
 
 
 
 [1]
 The NLRA is codified at 29 U.S.C. Sec. 151 et seq
 
 
 [2]
 On appeal Outboard does not contest the majority of unfair labor practices found by the Board. Among those issues not contested are the Board's findings that Outboard violated the NLRA section 8(a)(1) by threatening its employees with job loss, plant closure, the futility of supporting the Union and the futility of bargaining, threats concerning the signing of the decertification petition, threats that the strikers would not be recalled, not properly reinstating several strikers, improperly disciplining several strikers upon their return to work, and failing to bargain with the Union
 Outboard also violated section 8(a)(5) by improperly declaring an impasse, unilaterally implementing wage and benefit increases at the start of the strike, and refusing to bargain over employee training. Outboard violated section 8(a)(3) by discriminatorily issuing warnings to several of the returning strikers and discharging one. It also improperly refused to employ some of the strikers at their previous positions and pay. Accordingly, the Board's order in regard to these conclusions is enforced in full. See U.S. Marine Corporation v. NLRB, 944 F.2d 1305, 1314 (7th Cir.1991) (en banc ).