**U.S. SOIL CONDITIONING, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 78–1322, 78–1902.**

United States Court of Appeals, Tenth Circuit.

Argued Sept. 13, 1979.

Decided Oct. 12, 1979.

James E. Hartley, Denver, Colo. (Warren L. Tomlinson and Holland & Hart, Denver, Colo., of counsel, on brief), for petitioner.

Janet C. McCaa, N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on brief), for respondent.

Before HOLLOWAY and DOYLE, Circuit Judges, and MATSCH,* District Judge.

WILLIAM E. DOYLE, Circuit Judge.

The cause was argued and submitted to this court on September 13, 1979, on the petition of U.S. Soil Conditioning seeking a reversal of the decision of the NLRB entered on April 7, 1978. There is a cross-appeal on behalf of the NLRB seeking enforcement of its order. The original complaint alleged violations of § 8(a)(3) and (1) of the Act.

The complaint alleged that on June 2, 1976, the U.S. Soil Conditioning Company discharged one Joseph Dugan because of his membership and activities on behalf of the International Union of Operating Engineers, Local No. 9, AFL–CIO. An election was conducted on July 16, 1976, following a stipulation which was approved by the Regional Director, on June 28, 1976. The tally of ballots showed that of the 18 votes which were cast, there was an even division; nine were for and nine were against the certification. The tie breaking vote was that of Joseph Dugan, the man who was discharged.

The respondent company, which is owned by Joseph H. Lionelle, is a sole proprietorship engaged in the production and sale of trace material and other fertilizer products in Salida, Colorado. It denied the charge, but did admit that the company sold goods and shipped them in interstate commerce.

The voluminous record reflects the length, extent and extreme adversarial character of the hearing. The administrative law judge found the facts in favor of the respondent company. The Board, on the other hand, disagreed with this determination. Its view was that Dugan was discharged because of his union activity. Relief appropriate to this determination was granted in the Board's decree.

### PRELIMINARY STATEMENT

The NLRB general counsel called five witnesses: Joseph H. Lionelle; Joseph N. Dugan; Irene F. Dugan, Joe Dugan's wife; Clayton Ogden, a U.S. Soil quarry employee; and Clifton Ogden, another quarry employee and Clayton's brother. The witnesses for U.S. Soil were Marion Burr, a U.S. Soil secretary and accounting clerk; Harold L. Lewis, U.S. Soil controller; Joe Tancik, general overseer of plant and quarry operations and plant superintendent; Raymond Smith, quarry superintendent; Donald Lee Ackels, a U.S. Soil electrician; and Cecil Gehring, a quarry employee.

The crucial finding of the administrative law judge was that neither Lionelle, the owner of the plant, nor any of his agents apart from the employees participating, knew of the Union's efforts to organize the plant until June 10, 1976, when the notice of unfair labor practice charges and the formal representation petition were received at U.S. Soil, eight days after Dugan

---

* Richard P. Matsch of the United States District Court for the District of Colorado, sitting by designation.

942

was discharged. As a consequence, the administrative law judge found that the discharge of Dugan was the result of his having overstayed his authorized vacation by one week and that it was not on account of his union activities. On this account, the judge sustained the challenge to Dugan's ballot and exonerated U.S. Soil, holding that they had not engaged in any unfair practice.

The Board's evaluation was the opposite. It held that there existed ample circumstantial evidence that Lionelle and his agents were aware of his employees' organizational activities prior to the firing and that it was this factor and not the late return of Dugan from his vacation which caused the firing. The Board found, in addition, that Lionelle had an anti-union viewpoint and that the discharge of Dugan, occurring—as the Board determined—immediately after the presentation of the petition seeking representation, was explainable only as having been prompted by Dugan's union organizational activities.

The Board's legal view was that the company had violated § 8(a)(3) and (1) of the Act. It ordered the reinstatement of Dugan with back pay and ordered as well that the election which had been thrown out by the administrative law judge should be reinstated and that Dugan's ballot be counted. This court is called upon to decide whether there is substantial evidence from a consideration of the record as a whole to support the findings and conclusions of the Board.

The respondent, U.S. Soil, here maintains that there is not substantial evidence in the record as a whole. It claims that the Board erred by ignoring the credibility findings of the administrative law judge. It should be pointed out that the fact that the Board reached different factual conclusions that the administrative law judge is not as diabolic as respondent suggests. It does not bespeak per se invalidity. The issue, as noted above, is whether the Board's decision is based on substantial evidence.

## SUMMARY OF THE TESTIMONY FOR THE COMPANY

Much of the testimony on behalf of the respondent, U.S. Soil, centers on the shortcomings of Dugan. Indeed, it is much like a prosecution or at least a discrediting process. Joe H. Lionelle, the owner of the plant, was the principal witness. He testified that his first knowledge that the Union was attempting to organize the U.S. Soil Conditioning Company was when he received the notice from the Union. He denied that he had had any prior conversations with employees regarding the Union. He said that Joe Tancik, who was the superintendent of the plant, was responsible for hiring and firing. Lionelle did fire Dugan. The ultimate question is whether he fired him as a result of Dugan's taking an extra week of vacation allegedly without obtaining permission to do so. Lionelle called during the latter part of May, talked to Tancik, and asked him if Dugan had returned. He was told that he had not. Finally, on June 2, Tancik was told, according to this testimony, to fire Dugan. Whether Dugan had at least partial permission to take extra vacation was a disputed question.

There was a good deal of testimony from not only Tancik but also Ray Smith, who was the superintendent at the quarry, as to the competency of Dugan as an employee. Both Tancik and Smith said that Dugan was not a competent truck driver in that he mishandled the trucks. Also, Dugan was terminated once for having liquor on his breath during working hours. This was in February 1975, one and one-half years before this incident. Lionelle did testify that Dugan had somewhat of a liquor problem. However, this was not shown to have been a persistent problem which entered into the firing. But the testimony sought to establish that there were other problems such as the truck driving, which was just mentioned. From a review of the administrative law judge's findings, together with the evidence, Dugan did not appear to have a single redeeming quality.

Union activity had been going on for some period of time prior to the time of the firing, and the employees, those who desired the Union at least, had met on many occasions. There is considerable conflict as to whether these meetings were secretly carried on so as to escape the attention of management. There was evidence that at the quarry where Dugan worked, there was regular discussion during the noon hour of the union question. Some of this conversation was said to have taken place in the presence of Mr. Ray Smith, who was the superintendent of the quarry. He, however, claimed that he had not heard such discussions. Also, Ray Smith's son, Jerry, was an employee of the company who attended all of the organization meetings, and there were several, and it is, of course, argued that since he was close to his father there was some communication of the union activity to Ray Smith. However, the administrative law judge rejected all of this evidence and this conclusion.

Lionelle and Tancik, who was the general superintendent of the company, asserted that their first knowledge of the union activity came when the formal petition was presented June 10, eight days after Dugan was fired. There is no dispute, however, that the just-mentioned petition was presented to the employees for their signatures, including Dugan, on the very day that he was fired.

It will not help in this present effort to detail many scraps and bits of testimony that were considered by both the administrative law judge and the Board in reaching their respective conclusions. It will, however, be of some value to briefly consider the findings and conclusions of both.

## THE APPLICABLE LAW

We have referred to the substantial evidence test governing agency review in a court. We note that it admonishes the reviewing court to regard the findings of the Board as to questions of fact supported by substantial evidence on the record considered as a whole to be conclusive. 29 U.S.C. § 160(e) (1976). See also 29 U.S.C.

§ 160(f). This standard was enacted by Congress in the Taft-Hartley Act in 1947, and is in accordance with the Administrative Procedure Act.

In the year 1951, the Supreme Court decided *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477–486, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In a very lucid opinion authored by Mr. Justice Frankfurter, the Court interpreted the above-cited statute. Its pronouncements continue to be regarded as authoritative and no effort has been made to improve upon them. The Supreme Court in this important decision said that:

"[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126. Accordingly, it "must do more than create a suspicion of the existence of the fact to be established. * * * it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Board v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660.

340 U.S. at 477, 71 S.Ct. at 459.

The Supreme Court was dealing with a case in which there was a conflict such as the present one. The trial examiner had reached one conclusion and the Board had reached the opposite result. The court of appeals had, however, gone further than it needed to go. It had ruled that it was barred from taking into account the examiner's findings insofar as they had been rejected by the Board. The Supreme Court said that such findings were not unassailable and could be reversed by the Board even when they were not clearly erroneous. But the Court also said that "[w]e do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its

examiner disagree. \* \* \* The findings of the examiner are to be considered along with the consistency and inherent probability of testimony." 340 U.S. at 496, 71 S.Ct. at 469.

Although the Board reversed the case, it also held evidence which was not dissimilar to the evidence in this case to be legally sufficient. It said in part:

> \* \* \* it is clear from the court's opinion in this case that it in fact did consider the "record as a whole," and did not deem itself merely the judicial echo of the Board's conclusion. The testimony of the company's witnesses was inconsistent, and there was clear evidence that the complaining employee had been discharged by an officer who was at one time influenced against him because of his appearance at the Board hearing. On such a record we could not say that it would be error to grant enforcement.

340 U.S. at 491–492, 71 S.Ct. at 466.

The Supreme Court remanded the case to the court of appeals for further consideration in the light of its opinion. It gave the court freedom to grant or deny enforcement "as it thinks the principles expressed in this opinion dictate." 340 U.S. at 497, 71 S.Ct. at 469. The opinion also required the appellate court to weigh the findings of the administrative law judge (who, at the time of the decision, was called an examiner), considering whether the conclusion of the examiner detracts from the substantiality of the evidence in support of the Board's opposite conclusion.

The decision had another effect. It dispelled the notion that the NLRB occupied a preferential role among administrative tribunals. No longer could its decision overcome the findings of the examiner by simply adopting a contrary viewpoint.

Still a further result of *Universal Camera* was its withdrawal of the court of appeal's position as a third fact finder. *See NLRB v. Enterprise Ass'n of Pipefitters Local 638*, 429 U.S. 507, 531–32, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977). Courts of appeals do not have unlimited authority or discretion to set aside NLRB orders by making contrary alternative inferences from the record evidence. This doctrine has been adhered to in the Tenth Circuit. *See, e. g., Head Div., AMF, Inc. v. NLRB*, 593 F.2d 972, 982 (10th Cir. 1979); *Kustom Electronics, Inc. v. NLRB*, 590 F.2d 817, 821 (10th Cir. 1978); *Burns International Security Services, Inc. v. NLRB*, 567 F.2d 1015, 1019 (10th Cir. 1977); *NLRB v. Montgomery Ward & Co.*, 554 F.2d 996, 999 (10th Cir. 1977). "Our review is limited to searching the record to see if there is substantial evidence to support the fact findings . . . . We do not sit as a super trial examiner, and do not weigh the credibility of one witness against another nor do we search for contradictory inferences. . . . *N. L. R. B. v. Central Machine & Tool Co.*, 429 F.2d 1127, 1129 (10th Cir. 1970), *cert. denied*, 401 U.S. 909, 91 S.Ct. 870, 27 L.Ed.2d 807 (1971).

> We are not in a position to sit as trier of fact . . . reweighing the evidence and making credibility determinations of our own, nor is it our function to search for possible inferences contrary to those drawn by the NLRB from a particular fact. . . . That an inference other than the one drawn by an agency might also be drawn from a particular fact or set of facts does not mean the agency's conclusion is not supported by substantial evidence. . . .

*Head Div., AMF, Inc. v. NLRB, supra*, 593 F.2d at 982 n.20. In effect, in reviewing questions of fact, a court of appeals has less discretion to overturn an NLRB determination than the NLRB has to reject conclusions of its administrative law judge. "[T]he Board is not bound by findings and conclusions of an administrative law judge and is free to draw its own inferences as well as conclusions when its broader experience and expertise is applicable." *Burns International Security Services, Inc. v. NLRB, supra*, 567 F.2d at 948, citing *Ann Lee Sportswear, Inc. v. NLRB*, 543 F.2d 739 (10th Cir. 1976). On the other hand, a reviewing court *is* bound to uphold the Board's factual findings so long as they are supported by substantial evidence on the record in its entirety. *See* 29 U.S.C. § 160(e) (1976).

Finally, the standard of judicial review in NLRB cases is not altered merely because the administrative law judge and the Board have reached contrary conclusions. The substantial evidence test is not modified. *Universal Camera Corp. v. NLRB, supra,* 340 U.S. at 496, 71 S.Ct. 456. *Universal Camera* contemplates that the court will scrutinize the record as a whole and fully consider the strength of the findings of the administrative law judge and those of the NLRB as well with a view toward ascertaining whether the administrative law judge's findings detract from the substantiality of the evidence relied on by the NLRB. *Id.* at 496, 71 S.Ct. 456. *See Cartwright Hardware Co. v. NLRB,* 600 F.2d 268, 270 (10th Cir. 1979). *Cf. Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074, 1078 (9th Cir. 1977).

*Universal Camera* and its progeny then can be summed up as calling for a detached and careful examination of the findings of the administrative law judge as well as the NLRB in the light of the evidence offered by the adversaries. There must, of course, be a painstaking consideration of the record as a whole.

## THE FINDINGS AND CONCLUSIONS OF THE ADMINISTRATIVE LAW JUDGE

The fact that the administrative law judge was very positive and was confident in his findings certainly gives us pause. These findings were extensive and somewhat detailed. The judge gave full acceptance to the testimony favorable to the respondent company and completely rejected the witnesses called by the general counsel.

Some excerpts from the administrative law judge's findings illustrate the tendency of the judge to "credit" certain witnesses, for example, Lionelle, and to "discredit" the witnesses who testified contrary to this personal standard: "According to Tancik, whom I credit, in about February 1975, Tancik smelled liquor on Dugan's breath and terminated him." Following this, Linoelle, the owner, told Dugan to talk to Tancik again and see if he would put him back to work.

In passing, the judge said that "Further, Tancik made a favorable impression as a witness, and his version of the foregoing events is consistent in material respects with the witness of Lionelle and Ray Smith, whereas Dugan was contradictory and confusing. Accordingly, I credit Tancik and find that Dugan was first terminated by him in about February, 1975, for drinking on the job."

The judge's evaluations had a tendency to be based on personalities of the witnesses. He referred, for example, to Clifton and Clayton Ogden, brothers, who testified against the company as follows: "Throughout their testimony, the Ogden brothers impressed me that they were trying to make a case for Dugan, regardless of the truth. Hence, where their testimony conflicts, as above, with any of the other witnesses, I credit the testimony of the other witnesses."

The judge went on to consider the testimony of Gehring and Ackels, who testified on behalf of the company, and said: "The testimony of Ackels and Gehring corroborates in substance Lionelle's version of the meeting. In these circumstances, their testimony regarding what transpired at the February, 1976 meeting is credited over that of the Ogdens."

The judge referred once to the testimony of Dugan as being "vague and in generalities," and was limited to one particular occasion "when the wind was blowing and everyone was disgusted."

One of the foremen, Ray Smith, had a son, Jerry, who took part in the effort to organize the Union. There was some testimony that Ray Smith heard conversations which took place in the quarry. However, the judge refused to accept testimony regarding circumstances which might point to the communication of knowledge to Ray Smith, who was in close touch with Lionelle. The judge accepted the testimony of Ackels, saying "Further, Ackels credibly testified to specific instances when employees had either 'hushed up' or changed the

subject when Ray Smith came into view." Further, the judge found "Gehring, who also works at the quarry and who ate lunch with the other employees, impressed me as an honest witness when he testified, in confirming Ray Smith and refuting Dugan and the Ogden brothers that the subject of the Union was never brought up during lunch conversations at the quarry. Accordingly, I conclude and find that Ray Smith was not knowledgeable of the Union organizing efforts of the employees until a copy of the Petition filed with the Board was received by Respondent on June 10."

On the question whether Dugan had taken an extra week's vacation without leave, so to speak, the administrative law judge said: "In making my determination of credibility over this issue, I note there is no corroboration for Dugan's testimony that all of the employees in the quarry talked to Smith in April about arranging vacation dates and that Smith authorized him to take two weeks." (Dugan maintained that he had obtained permission from Lionelle to have three or four extra days.) In connection with this, the judge said: "Lionelle, Tancik and Ray Smith all impressed me as open and forthright witnesses who were telling the truth, whereas Dugan seemed disposed to shade his testimony as did both of the Ogden brothers, to vent a bias against Smith and Lionelle. * * *. I credit the testimony of Smith, Tancik and Lionelle over that of Dugan, and find that he was authorized to take a one-week vacation * * *."

In dealing with the question as to when Dugan signed the petition, the judge stated that: Dugan said he signed it at 1:00 p. m. on June 2. Dugan signed as the eighth name. Ackels was the seventh signer. According to Dugan, he was terminated after he had signed it. The judge said, in support of the contention of the company that Dugan did not sign the petition until after his termination, that "Ackels testified that the first knowledge he had of the Union was when Parkhill asked him to sign the petition about 4:00 p. m. on June 2 because 'they wanted to get as many names on it as possible before they had the Union repre-

sentative come down and talk with us.' " Ackels, according to further statement of the judge, said that when he signed it Dugan's signature was not on it. "I credit Ackels, whom I previously found to be a creditable witness, over Dugan, and find that Dugan didn't sign the petition until after he had been advised of his termination by Tancik."

Mrs. Dugan testified that Mr. Lionelle's personal secretary, Marion Burr, telephoned her on June 1 asking her where her husband was. Mrs. Dugan testified to a lengthy, somewhat involved conversation in the course of which Marion Burr asked her whether Joe Dugan was mixed up in anything at the plant and said "there is something going on down there." According to Mrs. Dugan, Marion Burr also said: "Joe [Lionelle] is in an uproar, something about the Union . . ." Marion Burr added "Are you sure Joe is not mixed up in this?" She said further, according to the testimony of Mrs. Dugan, "Well, you know, Irene, if he is, there is going to be hell to pay . ." The judge said, regarding the conversation, "I have carefully reviewed the testimony and considered the demeanor of the witnesses and credit the testimony of Mrs. Burr over that of Mrs. Dugan." He further said "Accordingly, I find that Mrs. Burr, who is a totally disinterested witness, was not aware of the Union until mid-June and that the statements attributed to her by Mrs. Dugan on June 1, were never made."

The judge finally found that neither Lionelle nor any of the respondent's agents were aware of the Union's organizing efforts until June 10, eight days after Dugan was terminated, and that the general counsel had failed to prove that the respondent's reasons for terminating Dugan were pretextual.

We are not saying that the administrative law judge did not make a conscientious effort in the premises. He lived with the case for a considerable period of time, and the conclusive approach which he used was in all likelihood influenced by his firsthand knowledge of the evidence together with

what would appear to have been subjective conclusions. In other words, we do not see him as applying objective tests of credibility. All in all, we do not regard his conclusions to be so well-reasoned and objective as to require this court to deduct from the substantiality of the findings and conclusions of the Board.

## THE OPINION OF THE LABOR BOARD

The Board's opinion did not directly challenge the findings of the administrative law judge. The Board did, however, issue some independent findings.[1] The focus of its opinion was on the question whether Dugan's late return from vacation was the real reason for his termination as the administrative law judge had found. The opinion calls attention to the testimony of Lionelle that he had actually made the decision to discharge Dugan before Dugan's return from vacation:

"I made up my mind quite a while before that. But then things come up that I asked by foreman down there to discharge him."

On being further cross-examined by attorneys for the general counsel, Lionelle said:

"I will try to simplify it as much as I can. I found him dishonorable, and Joe [Dugan] had a little drinking problem, and he has a habit of causing disturbances. In other words, he is not a man that I want to work around my crew."

In further response to the examination by his own counsel, Lionelle stated:

"I mean, this week here [the second week of Dugan's vacation] he missed doesn't have anything to do with me firing him because I was going to do it anyway and it has nothing to do with me firing him."

The administrative law judge overlooked this testimony altogether in the process leading to his conclusion that the late return from vacation was the cause of Dugan's termination.

The general counsel argues also that if Dugan had been authorized only a week's vacation and had taken extra leave without permission and this caused the decision to terminate him, why was he not terminated at once, that is, when he returned from work June 1, instead of waiting until the following day, which coincided with the initial circulation of the Union petition. The opinion of the Board also quotes the statement of Lionelle regarding the hiring and firing power in which he said that Tancik did all of the hiring. "After this damn Union thing started now, excuse me Judge, after this here, I want to hire all of them."

The Board's opinion, as noted, avoided line-by-line challenge of the very broad and general credibility determinations of the administrative law judge. However, it concluded that:

1. U.S. Soil was aware of the employees' union activity.

2. That U.S. Soil was motivated against the Union, as straightforwardly set

---

1. The essence of these findings is summarized as follows: (The Board's opinion does not list them in this order or in this form.)
 1. That Lionelle's testimony was to the effect that Dugan's vacation was not the actual cause for his discharge (this was at variance with the finding of the administrative law judge. However, he did not mention this evidence.)
 2. Lionelle did not give Tancik or Smith reasons for Dugan's termination nor was Dugan ever given these reasons. The Board said that this constituted a departure from past U.S. Soil practices.
 3. That Lionelle departed from past practices by personally firing Dugan rather than having Tancik do it.
 4. Dugan's termination was on June 2, the day after he returned from vacation. This

was the same day that an informal petition for union representation was being circulated among the men.
 5. That a remark made by Lionelle during his testimony constituted an admission of anti-union motivation.
 6. That the reasons Lionelle offered to justify Dugan's termination (Dugan's incompetence, his drinking problem, and his dishonorable character) were of a "shifting nature" and were based on incidents remote in time from the date of his termination.
 7. That the son of one of Lionelle's supervisors was deeply involved in the union organizational drive, and his father must have known of the union efforts.

out in Lionelle's testimony to the effect that "after this damn Union thing" arose, all hiring matters were to be addressed to him.

3. That Dugan's discharge, in view of its timing, nature and the departure from past practice it evinced, could only be explained as motivated by his organizational activity on behalf of the union and not the numerous and shifting considerations raised by U.S. Soil.

Footnote 10 of the Board's opinion reads as follows:

Respondent contends that to find a violation of Sec. 8(a)(3) in this proceeding requires reversal of the Administrative Law Judge's credibility resolutions. What we hold, however, is that, even accepting those credibility resolutions, a violation of Sec. 8(a)(3) and (1) has been established. The ultimate question presented is not one of credibility: it is of fact and we do reverse the Administrative Law Judge's ultimate finding of fact that Dugan was not discriminatorily terminated. As the court stated in *Shattuck Denn Mining Corporation (Iron King Branch) v. N. L. R. B.*, 362 F.2d 466, 470 (C.A. 9, 1966):

Actual motive, a state of mind, being the question, it is seldom that direct evidence will be available that is not also self-serving. In such cases, the self-serving declaration is not conclusive; the trier of fact may infer motive from the total circumstances proved. Otherwise no person accused of unlawful motive who took the stand and testified to a lawful motive could be brought to book.

## COMMENTS ON THE RECORD AS A WHOLE

 As we indicated earlier, the respondent would have us pursue a detailed study of the record, which we have done, and make a choice between the determinations of the administrative law judge and the Board on the ground that the manifest weight of the evidence favors the determination by the administrative law judge. Obviously, we cannot proceed in this way, either directly or indirectly, and in view of the state of the record, we find it impossible to set aside the decision of the Board in favor of the findings and determinations of the administrative law judge, because we determine that there is substantial evidence in the record as a whole which supports the position adopted by the Board, which is that the firing was the result of the union activity of Dugan.

Possibly, there were incidents in Dugan's two-year employment with U.S. Soil Conditioning Company which would have justified his being fired, and it would have constituted a nondiscriminatory termination. The Board, however, concluded that the immediate or proximate cause of the firing was Dugan's participation in the effort to organize a union.

We have to recognize, of course, that the Board has expertise in this area and that it is accustomed to evaluating the traumatic effect on a company of a campaign such as this to establish a union. This is one of the weaknesses of the administrative law judge's determination. He had no difficulty whatsoever discounting entirely the possibility that the union activity came to the attention of the company and that it was a factor in the firing. The inferences to be drawn from the nature of the organizational activity certainly permitted the drawing of the conclusion that it came to the attention of the company. A background factor is that this was a very small enterprise having a limited number of employees and supervisors, and they worked in close quarters. Salida is also a relatively small city. The activity would not be unimportant news. The exclamations of Mr. Lionelle show that he had strong feelings on this subject, and it is understandable why, because it would bring about a highly significant change in the organization.

It is also to be remembered that Dugan's deficiencies had not previously caused major concern. The incident when Tancik had detected liquor on Dugan's breath during working hours caused the major concern

because he was terminated, but Dugan was reinstated, after he pledged to renounce this. The only other time that he was perceived to be under the influence was at the Lionelle ranch on a nonworking day—a Sunday. No consequence flowed from this.

No doubt his driving might have been hard on the equipment, but this did not cause his firing. So, it comes down to whether he failed to return on time or, on the other hand, whether he was known to have participated in the union activity. The union question was a grave one, and so it surely does not come as a surprise that the Board would adopt the decision that it reached.

In summary, the Board's reasoning was based on the substantial evidence from the record considered as a whole, including the decision of the administrative law judge.

It follows that the order should be and the same is hereby directed to be enforced.