22 F.3d 1493
 146 L.R.R.M. (BNA) 2129, 62 USLW 2720,
128 Lab.Cas. P 11,114
 PHELPS DODGE MINING COMPANY, TYRONE BRANCH; Phelps Dodge
Copper Products Company, El Paso Rod Mill, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
United Steelworkers of America, International Brotherhood of
Teamsters Local 104, International Union of
Operating Engineers, Local No. 953,
AFL-CIO, Intervenors,
American Mining Congress, Amicus Curiae.
 No. 92-9556.
 United States Court of Appeals,
Tenth Circuit.
 April 26, 1994.
 
 Philip A. Miscimarra (Joel H. Kaplan and Amy Hartman, of Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL; and Andrew C. Hartzell, Jr. and Philip L. Harvey, of Debevoise & Plimpton, New York City, were with him on the briefs), of Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for petitioners.
 Joseph A. Oertel (Jerry M. Hunter, Yvonne T. Dixon, Nicholas E. Karatinos, Aileen A. Armstrong, and Howard E. Perlstein, N.L.R.B., Washington, DC, were with him on the brief), N.L.R.B., Washington, DC, for respondent.
 Melvin P. Stein (John L. Hollis, of John L. Hollis, P.A., Albuquerque, NM, was with him on the brief), of Melvin P. Stein, P.C., Pittsburgh, PA, for intervenors.
 Rosemary M. Collyer and Michael A. Bazany, Jr., of Crowell & Moring, Washington, DC, for amicus curiae American Mining Congress; and Edward M. Green, General Counsel, American Mining Congress, Washington, DC, of counsel.
 Before TACHA, HOLLOWAY, and KELLY, Circuit Judges.
 TACHA, Circuit Judge.
 
 
 1
 Phelps Dodge Mining Company, Tyrone Branch, and Phelps Dodge Copper Products Company, El Paso Rod Mill (collectively "Phelps Dodge" or "the company") petition for review of a National Labor Relations Board ("NLRB" or "the Board") decision and order finding that Phelps Dodge violated Secs. 8(a)(5), 8(a)(3) and 8(a)(1) of the National Labor Relations Act ("the Act"), 29 U.S.C. Secs. 158(a)(5), 158(a)(3) and 158(a)(1). The NLRB applies for enforcement of its order. We exercise jurisdiction pursuant to 29 U.S.C. Sec. 160(e) and (f) and set aside the Board's order.[1]
 
 I. BACKGROUND
 
 2
 Phelps Dodge operates eight copper mining and processing facilities at five locations in the United States, employing both union-represented and unrepresented workers. Most of the hourly ("day's pay") employees at the Phelps Dodge mine at Tyrone, New Mexico are jointly represented by the United Steelworkers of America ("Steelworkers"), the International Brotherhood of Teamsters, Local No. 104 ("Teamsters") and the International Union of Operating Engineers, Local No. 953, AFL-CIO ("Operating Engineers") under the title "PACT Union". The PACT Union and the Tyrone mine are parties to a collective bargaining agreement covering the period April 1987 through June 1991. The day's pay employees at the El Paso rod mill are represented by the International Brotherhood of Electrical Workers ("IBEW").[2] The IBEW labor agreement covers the period May 30, 1988 through May 29, 1991. The remainder of Phelps Dodge's employees are unrepresented and work at several "non-union facilities": a rod mill at Norwich, Connecticut; a refinery at El Paso, Texas; a mine at Morenci, Arizona and smelting operations at Hidalgo and Hurley, New Mexico.
 
 
 3
 Between October 1985 and August 1989, Phelps Dodge made eight payments to the day's pay employees at its different facilities. The amount of these "appreciation payments" or "bonuses" varied, as did the employees who received them, and the payments were made on a random, unscheduled basis.
 
 
 4
 In March 1990 Phelps Dodge implemented a program entitled the "Phelps Dodge Mining Company Union Free Day's Pay Quarterly Appreciation Payment Program" (the "1990 Quarterly Payment Program"). The 1990 Quarterly Payment Program provides for regular, quarterly payments to Phelps Dodge's unrepresented day's pay employees based on a formula linked to the current commodity exchange price of copper ("Comex price"). The PACT Union and the IBEW then filed unfair labor practice charges against Phelps Dodge, alleging that the exclusion of the unionized employees at the Tyrone mine and the El Paso rod mill from the 1990 Quarterly Payment Program interfered with protected rights, discriminated against union-represented employees and constituted a unilateral mid-contract change.
 
 II. ANALYSIS
 A. NLRB'S Decision and Order
 
 5
 The NLRB affirmed and adopted the Administrative Law Judge's ("ALJ") decision and order. The ALJ concluded that Phelps Dodge unilaterally changed employment terms affecting the El Paso rod mill and Tyrone mine bargaining unit employees, thus violating Sec. 8(a)(5) of the Act, when it discontinued the 1985-1989 payment program (which covered union-represented employees) and implemented the 1990 Quarterly Payment Program (which excluded union-represented employees) in its place. The ALJ also found that Phelps Dodge violated Sec. 8(a)(3) because it excluded union-represented employees from the 1990 Quarterly Payment Program based solely on their union status. Finally, the ALJ held that Phelps Dodge violated Sec. 8(a)(1) of the Act by using the term "union free" in describing the 1990 Quarterly Payment Program.
 
 B. Standard of Review
 
 6
 We must accept the NLRB findings unless we "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).
 
 C. Section 8(a)(5) Violation
 
 7
 Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. Sec. 158(a)(5). Section 8(d) of the Act treats "wages, hours, and other terms and conditions of employment" as mandatory bargaining subjects. 29 U.S.C. Sec. 158(d). Finding that the 1985-1989 payments were existing "terms and conditions" of the union-represented employees' employment, the ALJ concluded that Phelps Dodge violated Sec. 8(a)(5) when it unilaterally discontinued the 1985-89 payment "program" and implemented the 1990 Quarterly Payment Program without notifying and bargaining with the union representatives about the change. Our review is limited to whether substantial evidence supports the Board's finding that Phelps Dodge violated Sec. 8(a)(5) of the Act.
 
 
 8
 An employer violates Sec. 8(a)(5) of the Act when she unilaterally alters "wages, hours, and other terms and conditions of employment" without first notifying and bargaining with the union. NLRB v. Katz, 369 U.S. 736, 742-43, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962). It is undisputed that Phelps Dodge did not notify or bargain with the unions when it discontinued the 1985-1989 payments and implemented the 1990 Quarterly Payment Program. Thus, the critical inquiry is whether the 1985-1989 payments qualify as "wages" or "other terms and conditions of employment."
 
 
 9
 The 1985-1989 "appreciation payments" or "bonuses" are considered "wages" or "other terms and conditions of employment" "if they are of such a fixed nature and have been paid over a sufficient length of time to have become a reasonable expectation of the employees and, therefore, part of their anticipated remuneration." NLRB v. Nello Pistoresi & Son, Inc., 500 F.2d 399, 400 (9th Cir.1974); see e.g. Century Elec. Motor Co. v. NLRB, 447 F.2d 10, 14 (8th Cir.1971). Payments to employees which are fixed as to timing but discretionary in amount do not become part of the employees' reasonable expectation and thus are not considered "terms and conditions" of employment. See Daily News of Los Angeles v. NLRB, 979 F.2d 1571, 1575 (D.C.Cir.1992). Moreover, "[i]n determining whether a particular practice should be characterized as a term or condition of employment, the Board has examined the regularity of the practice and the way in which the employer has treated it." Guy Gannett Publishing Co., 295 NLRB 376, 378 (1989).
 
 
 10
 Here, Phelps Dodge made eight payments to various employees during the period 1985 to 1989:
 
 
 11
 (1) 10-3-85 Paid to employees of all facilities except Norwich, Connecticut rod mill. Twenty hours at employee's straight time rate of pay.
 
 
 12
 (2) 7-23-86 Paid to all employees companywide. Twenty hours at employee's straight time rate of pay.
 
 
 13
 (3) 2-87 Paid to employees at the El Paso refinery only. Paid on a two-tier approach, based on either fifty hours or ten hours multiplied by an employee's straight time rate of pay.[3]
 
 
 14
 (4) 8-3-87 Paid to employees of all facilities, excluding the Norwich, Connecticut rod mill, the El Paso, Texas rod mill, and the El Paso, Texas refinery. Twenty hours at employee's straight time rate of pay.
 
 
 15
 (5) 12-15-87 Paid to all employees companywide. One dollar an hour for hours worked and vacation hours during prior twenty-six week period.
 
 
 16
 (6) 5-88 Paid to all employees companywide. Eighty hours at employee's straight time rate of pay.
 
 
 17
 (7) 11-18-88 Paid to all employees companywide. Two dollars an hour for hours worked and vacation hours during prior twenty-six week period.
 
 
 18
 (8) 8-89 Paid to all employees companywide. One dollar an hour for hours worked and vacation hours during prior twenty-six week period.
 
 
 19
 From these eight payments, the ALJ concluded that Phelps Dodge's so-called "appreciation payments" constituted "wages" or "terms and conditions" of the union-represented employees' employment. The record, however, does not contain substantial evidence to support the ALJ's conclusion that the eight payments in 1985-1989 were of such a fixed nature to rise to the level of an established "term and condition" of employment.
 
 
 20
 In Ithaca Journal-News, Inc., the NLRB found that merit increases given to employees were entirely discretionary because the timing, amount and selection of employees to receive the increases had not been determined in any consistent manner. 259 NLRB 394, 395 (1981). Of the thirteen employees eligible for an increase, ten employees received one increase and three employees received no increase. Id. The following year, of eighteen eligible employees, two received two increases, nine received one increase, and seven received no increases. Id. While most of the increases were given in June, a significant number were given in various other months. Id. The amounts of the increases did not follow any discernible pattern. Id; see also Daily News, 979 F.2d at 1575 (pattern of increases fixed as to timing but discretionary as to amount lacks character of an established practice); American Mirror Co., 269 NLRB 1091, 1094 (1984) (finding that company's periodic wage increases did not establish a pattern or practice); cf. UARCO, Inc., 283 NLRB 298, 300 (1987) (employer unlawfully discontinued an established seventeen-year annual wage increase to newly represented employees); Southeastern Michigan Gas Co., 198 NLRB 1221, 1222-23 (1972) (employer violated Sec. 8(a)(5) by discontinuing established twenty-year practice of biannual wage increases).
 
 
 21
 Like the payments in Ithaca, the eight payments made by Phelps Dodge between 1985 and 1989 followed no predictable pattern. The payments were spread over forty-seven months. Beginning with the first payment in 1985, the amount of time between the payments was, respectively, nine months, seven months, six months, four months, five months, six months and nine months. Five of the payments were companywide, one payment went to all employees except the Norwich, Connecticut rod mill employees, one payment went to the El Paso, Texas refinery employees only, and one payment went to all employees except those at the Norwich rod mill, the El Paso rod mill, and the El Paso refinery. Additionally, the payments varied as to amount and as to the manner in which they were calculated. Further, the ALJ recognized that complaints about the predictability of the past appreciation payments had been voiced by both union and nonunion employees over the years. Because of the unscheduled nature and indefinite amount of these payments, we conclude that the employees had no reasonable expectation regarding the 1985-1989 payments, suggesting therefore, that these payments did not constitute "wages" or a "term and condition" of employment.
 
 
 22
 Phelps Dodge's treatment of the 1985-89 payments also shows that the eight payments did not constitute "wages" or a "term or condition" of employment. Guy Gannett, 295 NLRB at 378. In Phelps Dodge's President and CEO Leonard Judd's cover letter accompanying the first of the eight payments, he recognized that "whether additional such payments can be made in the future ... will depend upon economic developments in the copper industry and upon the company's financial condition and performance." The letters accompanying the subsequent payments contained similar disclaimers. Judd also testified that Phelps Dodge was careful not to pattern the payments in order to refrain from creating expectations in the employees regarding future payments. Phelps Dodge wanted to retain full discretion in awarding payments. The ALJ relies on this evidence to conclude that, because Phelps Dodge intentionally made the payments irregularly to avoid employee expectations, the company engaged in a pattern, thus supporting the ALJ's conclusion that the payments were a "term and condition of employment." However, a conscious attempt to make payments irregular does not per se establish a pattern. In this case, due to the other factors on which the timing of the payments turned, we find that no pattern was established. Moreover, the fact that the company did not treat the payments as a regular term of compensation suggests that no pattern was established.
 
 
 23
 Judd also testified that the timing of the eight payments was determined by several different occurrences. Some payments were made to offset employee feelings toward the company when the company was raising executive salaries or paying shareholder dividends. Other payments were made at a particular time to alleviate the employees' uncertainty regarding wage cuts. The ALJ stated that he would
 
 
 24
 infer from all of this that the Respondent had decided early on as a matter of policy that Respondent would periodically share profits with its employees, but for its own reasons, had decided to disguise the "programatic" [sic] quality of this policy so as to retain maximum flexibility or "discretion" in applying it.
 
 
 25
 The ALJ further found that the seven multi-facility payments were linked to company profitability. We find it significant that the payments were tied to unpredictable, and discretionary factors such as company profitability, conditions in the industry and the actions of their competitors. Thus, examining the manner in which the company treated the payments leads us to conclude that the 1985-1989 payments were viewed by Phelps Dodge as discretionary gifts rather than wages.
 
 
 26
 Because we find that the employees had no reasonable expectations concerning the payments and that the company based the payments on unpredictable, discretionary factors, we do not find substantial evidence to support a finding that the 1985-1989 payments were "wages" or "terms and conditions" of employment under Sec. 8(d). 29 U.S.C. Sec. 158(d).
 
 D. Section 8(a)(3) Violation
 
 27
 Section 8(a)(3) of the Act makes it an unfair labor practice for an employer to discriminate "in regard to ... any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. Sec. 158(a)(3). Finding that Phelps Dodge implemented the "Phelps Dodge Mining Company Union Free Day's Pay Quarterly Appreciation Payment Program" to induce employees to become union-free or to refrain from becoming represented, the ALJ concluded that Phelps Dodge violated Sec. 8(a)(3). Our review is limited to whether substantial evidence supports the Board's finding that Phelps Dodge discriminated against union-represented employees at the El Paso rod mill and the Tyrone mine by excluding them from participation in the 1990 Quarterly Payment Program while including unrepresented employees in the program. See Universal Camera Corp., 340 U.S. at 488, 71 S.Ct. at 465 (reviewing court looks for substantial evidence of anti-union motivation in the record as a whole).
 
 
 28
 "Absent an unlawful motive, an employer is privileged to give wage increases to his unorganized employees, at a time when his other employees are seeking to bargain collectively through a statutory representative." B.F. Goodrich, Co., 195 NLRB 914, 914 (1972) (quoting Shell Oil Co., 77 NLRB 1206, 1310 (1948)). The granting of "benefits to unorganized employees but not to represented employees is not, standing alone, prohibited discrimination." Id. However, if the granting of benefits is "accompanied by statements encouraging the employees to abandon collective representation in order to secure the benefit[s], for example, we would have clear evidence of unlawful Sec. 8(a)(3) motivation." Id. at 915 n. 4. The ALJ concluded that the company had an unlawful anti-union animus because it used the words "union free" to describe the 1990 Quarterly Payment Program. We disagree. Contrary to the ALJ's conclusions, Phelps Dodge's mere use of the two words "union free" to describe the 1990 Quarterly Payment Program does not amount to a "statement[ ] encouraging the employees to abandon collective representation in order to secure the benefit." The use of the words "union free" does not provide clear evidence an unlawful motive and does not support a finding of a Sec. 8(a)(3) violation. Id.[4]
 
 
 29
 The ALJ concluded the use of the "union free" term showed an anti-union animus because the "union free" payment program was implemented in the third-year of a four-year contract with the 450 union-represented employees at the Tyrone mine. Thus, inferred the ALJ, the implementation of the "union free" quarterly payment program shortly before the Tyrone employees would be in a position to vote on decertifying the union was of such a character that it carried an "inherently union-discouraging" message which proved Phelps Dodge's underlying improper intent. The ALJ also found that, because Phelps Dodge's 1985-1989 payments were "timed" to convey particular messages, the only conceivable message at the time the 1990 Quarterly Payment Program was implemented was an anti-union message designed to coincide with the "soon-to-arrive window period for an election [decertification] petition at Tyrone." We disagree. The fact the window period for a decertification vote at the Tyrone mine was approaching at the time of the implementation of the 1990 Quarterly Payment Program does not conclusively establish an unlawful discriminatory motive. The ALJ stated that there was no evidence to show that Phelps Dodge attempted to promote decertification at Tyrone other than by implementing the "union free" 1990 Quarterly Payment Program. In fact, the record indicates that Phelps Dodge bargained with the PACT Union at Tyrone to extend the represented employees' contract for an additional period prior to the implementation of the new 1990 Quarterly Payment Program.[5]
 
 
 30
 The ALJ inferred a discriminatory intent based on his view that Phelps Dodge discontinued a prior payment program which included represented employees, the 1985-1989 payments, and implemented a program which excluded union represented employees, the 1990 Quarterly Payment Program. From this "change" the ALJ ascribed a union-discriminatory motive to Phelps Dodge's implementation of the 1990 Quarterly Payment Program. Finding incredible Phelps Dodge's President and CEO and Director of Employee Relations' denials of a continuous relationship between the 1985-1989 payments and the new 1990 payments, the ALJ also inferred that Phelps must be "trying to conceal a darker underlying motive for embarking on the 1990 program"--that of a "nakedly union-discriminatory" motive. Because we find that the 1990 Quarterly Payment Program was not a continuation of the eight 1985-1989 payments, the ALJ's inference of an improper motive from the discontinuance of the 1985-1989 payments is without substantial evidentiary support.
 
 
 31
 In short, we find that none of the factors enumerated by the ALJ equal "statements encouraging the employees to abandon collective representation in order to secure the benefit." B.F. Goodrich, 195 NLRB at 915 n. 4. Further, the ALJ's stated reasons for his inference of an anti-union animus are not supported by substantial evidence in the record as a whole. In the absence of union discriminatory motives in withholding a benefit from represented employees, we hold that Phelps Dodge did not violate Sec. 8(a)(3) when it implemented the 1990 Quarterly Payment Program.
 
 E. Section 8(a)(1) Violation
 
 32
 Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7 of the Act]." 29 U.S.C. Sec. 158(a)(1). Section 7 rights include the right "to self-organization, to form, join, or assist labor organizations [and] to bargain collectively through representatives of their own choosing." 29 U.S.C. Sec. 157. The ALJ concluded that Phelps Dodge violated Sec. 8(a)(1) because its use of the words "union free" to describe the 1990 Quarterly Payment Program "suggest[ed] that employees are automatically and irrevocably foreclosed from inclusion in [the] ... plan simply because they have a union bargaining on their behalf."
 
 
 33
 "[C]lauses in benefit plans that automatically exclude employees in a collective-bargaining unit violate the Act where they suggest that employees will necessarily lose existing benefits if they join a union and that coverage under such plans could not be gained through collective bargaining." Dallas Morning News, 285 NLRB 807, 808 (1987); Lynn-Edwards Corp., 290 NLRB 202, 208 (1988) (eligibility for plan limited to "full-time employees, except those covered by collective bargaining agreements). In B.F. Goodrich, the Board examined a plan which contained an eligibility provision limiting participation to employees not represented by a collective bargaining agreement. 195 NLRB at 914. The provision further provided that if an employee ceased to meet the eligibility requirements she would no longer be able to participate. Id. The Board determined that these eligibility provisions violated the Sec. 8(a)(1) rights of unrepresented employees because the plan disqualified participating employees from the plan upon their selection of a bargaining representative. Id. The Board, however, found that the eligibility provision did not violate the Sec. 8(a)(1) rights of represented employees because the plan did not prohibit their collective bargaining agent from bargaining with respect to their participation. Id. The Board has recognized that if a violation were found based solely on the fact that benefits were granted to unrepresented employees but not to represented employees "an employer would effectively be required to grant its unionized employees any benefit that the nonunit employees possessed." Dallas Morning News, 285 NLRB at 808-09.
 
 
 34
 In this case, the ALJ analogized the explicit eligibility requirements found in Lynn-Edwards to the words "union free" in the description and title of the 1990 Quarterly Payment Program, finding that the words "union free" "suggest[ed] that employees are automatically and irrevocably foreclosed from inclusion in [the] ... plan simply because they have a union bargaining on their behalf." Unlike the explicit eligibility requirements in Lynn-Edwards and B.F. Goodrich, the mere use of the words "union free" do not indicate that Phelps Dodge's unrepresented employees will be disqualified from participation in the 1990 Quarterly Payment Program upon selection of a bargaining representative. See B.F. Goodrich, 195 NLRB at 914. Nor do the words "union free" indicate that union-represented employees are prohibited from gaining coverage through collective bargaining. As a matter of fact, the unions did not request to bargain over the 1990 Quarterly Payment Plan, nor did Phelps Dodge refuse to bargain with the unions. The words "union free" do not foreclose Phelps Dodge's union-represented employees' collective bargaining agents from bargaining with respect to their eligibility to participate. Id. Thus, we hold that the use of the term "union free" in this case does not alone rise to the level of "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed in section [7 of the Act]." 29 U.S.C. Sec. 158(a)(1).
 
 III. CONCLUSION
 
 35
 Because we do not find substantial evidence in the record as a whole to support the NLRB's finding of Sec. 8(a)(5), 8(a)(3), and 8(a)(1) violations, we set aside the Board's order.
 
 
 36
 HOLLOWAY, Circuit Judge, concurring in part and dissenting in part:
 
 
 37
 I concur in the majority opinion to the extent it finds the evidence insufficient to support the Board's finding of a violation by Phelps Dodge of Sec. 8(a)(5) of the National Labor Relations Act. However, to the extent the majority finds the evidence insufficient to show a violation of Secs. 8(a)(1) and 8(a)(3) of the Act, I respectfully dissent.
 
 
 38
 * As always, our review of the Board's factual findings is limited to a determination of whether they are supported by substantial evidence. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). "If such evidence exists in the record considered as a whole, the Board's findings must be accepted without any necessity of searching for contrary alternative inferences that might also be drawn from the record evidence." N.L.R.B. v. Dillon Stores, 643 F.2d 687, 690 (10th Cir.1981) (citing U.S. Soil Conditioning v. N.L.R.B., 606 F.2d 940, 944 (10th Cir.1979)). In my view, the majority's rejection of the Board's Sec. 8(a)(1) and Sec. 8(a)(3) findings and its denial of enforcement of the portion of the Board's order dealing with the alleged violation of those sections results from two fundamental errors: 1) a failure to abide by the restrictions of the applicable standard of review of factual findings, and 2) a failure to give proper deference to the Board's expertise in judging the impact of statements and conduct by Phelps Dodge in the employer-employee relationship.
 
 
 39
 * With regard to Phelps Dodge's purported violation of Sec. 8(a)(3), the majority claims the record contains no substantial evidence indicating that the company intentionally discriminated against union employees and discouraged union membership by limiting participation in the 1990 bonus plan to non-union employees. Specifically, the majority finds insufficient the following facts relied on by the Board: 1) Phelps Dodge's description of the new program as "union-free," 2) the company's implementation of the new program shortly before the time when decertification might have sought at the Tyrone plant, and 3) the company's simultaneous discontinuation of the company's former union-blind bonus program. Op. at 1498-99.
 
 
 40
 Unlike the Board, the majority concludes that the company's use of the term "union-free" is not "clear evidence" of an unlawful motive; that the company's timing of the new bonus program does not "conclusively establish" an unlawful discriminatory motive; and that "the 1990 Quarterly Payment Program was not a continuation of the eight 1985-1989 payments." The majority thus finds that the company's introduction of the new program contemporaneously with the cessation of its prior payments does not warrant an inference of discriminatory motive. Id. With all due respect, none of the majority's points of departure from the Board's conclusions is grounded in legitimate substantial evidence review. Instead, the majority's reasoning is tantamount to reweighing of the record evidence and usurpation of the Board's right to draw inferences from the evidence.
 
 
 41
 In reviewing Board findings, our role is plainly limited to determining whether those findings are supported by substantial evidence. Universal Camera Corp., 340 U.S. at 488, 71 S.Ct. at 465. The fact that we may feel there is less than "clear evidence" of a particular fact, or that the record does not "conclusively establish" such a fact (op. at 1499), is simply irrelevant. Equally irrelevant is the susceptibility of the evidence to "contrary alternative inferences." Dillon Stores, 643 F.2d at 690. "If the Board has made a 'plausible inference from the evidence' we may not overturn its findings, although if deciding the case de novo we might have made contrary findings." Weather Tamer, Inc. v. N.L.R.B., 676 F.2d 483, 487 (11th Cir.1982) (quoting Sturgis Newport Business Forms, Inc. v. N.L.R.B., 563 F.2d 1252, 1256 (5th Cir.1977)) (emphasis added). And "[w]e give deference to the Board's expertise in judging the impact of statements made in the context of employer-employee relationships." Manna Pro Partners v. N.L.R.B., 986 F.2d 1346, 1351 (10th Cir.1993) (citing N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 620, 89 S.Ct. 1918, 1943, 23 L.Ed.2d 547 (1969). Such deference is particularly appropriate in reviewing a Board finding of discriminatory motive:
 
 
 42
 [T]he task of determining motive is "particularly within the purview of the Board." ... In determining motive, the Board may consider circumstantial and direct evidence, and its inferences will prevail if reasonable and supported by substantial evidence on the record as a whole.
 
 
 43
 N.L.R.B. v. Fort Vancouver Plywood, 604 F.2d 596, 600 (9th Cir.1979) (quoting N.L.R.B. v. Vangas, Inc., 517 F.2d 747, 748 (9th Cir.1975)), cert. denied, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980). Accord Purolator Armored, Inc. v. N.L.R.B., 764 F.2d 1423, 1429-29 (11th Cir.1985).
 
 
 44
 Here, the Board's inference of discriminatory motive, even if based primarily or exclusively on circumstantial evidence, is nonetheless plausible and therefore should not be set aside. N.L.R.B. v. Link-Belt Co., 311 U.S. 584, 602, 61 S.Ct. 358, 367, 85 L.Ed. 368 (1941) ("[t]he Board was justified in relying on circumstantial evidence of discrimination and was not required to deny relief because there was not direct evidence"). Specifically, the Board could reasonably find that Phelps Dodge's description of its new bonus program as "union-free" "carried an inherently union-discouraging message" and was used by the company "to make a decidedly negative statement about the word preceding 'free' " and to imply that "becoming or remaining nonunion was what the [company] was encouraging [the employees] to achieve, and what it was willing to pay bonuses for, under the new Program." III R., Doc. 1 at 29-30 (emphasis in original). The Board's interpretation of the term "union-free" is at least plausible, and the fact that the term may also be "capable of a noncoercive interpretation[ ]" is therefore immaterial; "[i]t is not for us ... to weigh differing interpretations." Fort Vancouver, 604 F.2d at 599 n. 1.
 
 
 45
 Similarly, the Board plausibly inferred that Phelps Dodge chose to introduce its new bonus plan shortly before a union decertification vote might have been requested in an attempt to discourage union representation. "Timing alone may suggest anti-union animus as a motivating factor in an employer's action." N.L.R.B. v. Rain-Ware, Inc., 732 F.2d 1349, 1354 (7th Cir.1984). Also plausible is the Board's inference of discriminatory intent from the company's introduction of the new bonus plan contemporaneously with the discontinuation of its 1985-1989 program. As stated by the Supreme Court, "[t]he act of paying accrued benefits to one group of employees while announcing the extinction of the same benefits for another group of employees who are distinguishable only by their participation in protected concerted activity surely may have a discouraging effect on either present or future concerted activity." N.L.R.B. v. Great Dane Trailers, 388 U.S. 26, 32, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967).
 
 
 46
 The majority's assertion that discriminatory intent cannot be inferred because the 1990 program was not "a continuation" of the 1985-1989 program (Op. at 1499) is unconvincing. The majority's finding of non-continuity, while perhaps a plausible view of the evidence, does not justify rejecting the Board's reasonable contrary finding. In addition, regardless of the degree of "continuity," Phelps Dodge's switch from a union-blind to a non-union only program in itself suggests anti-union animus (Rain-Ware, 732 F.2d at 1354), at least in the absence of a credible union-neutral explanation by the company:
 
 
 47
 [W]hen the Board produces evidence raising a reasonable inference of unlawful motive, the employer must explain its actions consistent with a legitimate motivation.... Determining the degree of significance to be accorded the employer's explanation is, within the bounds of reason, the primary responsibility of the Board. Against a prima facie showing of unlawful motivation, a flimsy or unsupported explanation may affirmatively suggest that the employer has seized upon a pretext to mask an anti-union motivation.
 
 
 48
 Dillon Stores, 643 F.2d at 692-93 (emphasis added). Accord Rain-Ware, 732 F.2d at 1354 ("[t]he presentation of implausible or shifting explanations for the alleged violation is a factor suggesting discrimination against union activity").
 
 
 49
 Though given the opportunity to do so, Phelps Dodge failed to provide a credible union-neutral explanation for the exclusion of union employees under its new bonus program. The Board discounted the explanations given by the company as having "a certain non sequitur quality" and as "sound[ing] hollow or improvised, and clash[ing] with one another in terms of their defensive value to the [company]." III R., Doc. 1 at 27-28. In light of these evidentiary findings and the facially discriminatory nature of the 1990 bonus program, the Board's inference of discriminatory motive in violation of Sec. 8(a)(3) should not be set aside.
 
 B
 
 50
 The majority also concludes that Phelps Dodge's description of the 1990 bonus program as "union-free" does not support a finding that Phelps Dodge violated Sec. 8(a)(1) because, in the majority's view, the term does not "suggest[ ] that employees are automatically and irrevocably foreclosed from inclusion in a particular plan simply because they have a union bargaining on their behalf." Op. at 1500 (quoting Kezi, Inc., 300 N.L.R.B. 594, 595 (1990)). The majority reasons that in the absence of evidence that the unions demanded bargaining over the new program and that the company expressly refused such a demand, the "mere use of the words 'union free' do not indicate that ... unrepresented employees will be disqualified from participation in the 1990 Quarterly Payment Program upon selection of a bargaining representative." Op. at 1500.
 
 
 51
 Again, I believe the majority's reasoning amounts to usurpation of the Board's function of making factual findings and drawing inferences. As noted, the Board could properly conclude that the new bonus program was labeled "union-free" because of the inherent anti-union connotations of that term and its implicit message that "becoming or remaining nonunion was what the [company] ... was willing to pay bonuses for, under the new Program." III R., Doc. 1 at 30. The Board could likewise find that the term "union-free," particularly in the factual context here, implies that "union members would not be eligible for benefits that were to be available to nonunion workers," and that the company's use of the term therefore demonstrates a violation of Sec. 8(a)(1). EPE, Inc. v. N.L.R.B., 845 F.2d 483, 487, 492 (4th Cir.1988) (employer "told employees that union members would not be eligible for benefits that were to be available to nonunion workers", inter alia); Niagara Wires, Inc., 240 N.L.R.B. 1326, 1327 (1979) ("it is well settled that the promulgation, maintenance, and publication of an employee benefit plan whose benefits are conditioned on the unrepresented status of the employees are themselves sufficient for finding an 8(a)(1) violation"); B.F. Goodrich, 195 N.L.R.B. 914, 915-16 (1972) ("[b]y granting to its unorganized employees participation in [a new benefit] plan while refusing to bargain with the Union concerning the participation by unit employees in the plan [from its effective date], the [employer] has engaged in an unfair labor practice within the meaning of Section 8(a)(1) of the Act").
 
 
 52
 In sum, I would uphold the Board's findings and enforce its order with respect to Sec. 8(a)(1) which bars interference with, restraint or coercion of employees in the exercise of their Sec. 7 rights.
 
 II
 
 53
 I respectfully dissent from the majority ruling to the extent it sets aside the portions of the Board's order addressing violations of Sec. 8(a)(1) and (3). I join the majority in setting aside the findings and order of the Board with respect to the Sec. 8(a)(5) violation the Board found.
 
 
 
 [1]
 We grant the motion of American Mining Congress to file an amicus curiae brief
 
 
 [2]
 The IBEW has not intervened in this appeal
 
 
 [3]
 The ALJ discounted the February 1987 payment because he found it was an anomaly and did not fit the "pattern" he saw in the other payments. We include this payment because it sheds light on the irregular pattern of payments during the 1985-89 period
 
 
 [4]
 We note that in B.F. Goodrich, the Board recognized that the unilateral grant of such a benefit to represented employees may actually constitute a separate Sec. 8(a)(5) violation. 195 NLRB at 914
 
 
 [5]
 In February 1989 Phelps Dodge engaged in negotiations with the PACT Union at Tyrone to extend the 1987-91 contract with a new four year agreement. The parties reached a tentative agreement on this new plan but it was voted down by the PACT membership